■ In the Matter of DENNIS MOOREHEAD, Respondent, v GINA MOOREHEAD, Appellant. (Proceeding No. 1.) In the Matter of GINA MOOREHEAD, Respondent, v DENNIS MOOREHEAD, Appellant. (Proceeding No. 2.) [602 NYS2d 403] —In two related proceedings for child custody pursuant to Family Court Act article 6, the mother appeals from so much of an order of the Family Court, Putnam County (Sweeney, J.), entered April 17, 1992, as granted joint legal custody of the children and which awarded physical custody to the father.

Ordered that the order is affirmed insofar as appealed from, without costs or disbursements.

The petitioner Dennis Moorehead and the cross petitioner Gina Moorehead separated in July 1990. Their daughter Alyssa was then three and one-half years old, and their son Dennis, Jr., was then one and one-half years old. Gina Moorehead initially retained physical custody of the parties' two children. However, the weight of the evidence establishes that within less than one year, on February 2, 1991, she agreed in writing to transfer de facto custody of the two children to Dennis Moorehead. As a consequence, Mr. Moorehead has now had custody of the two children for approximately two and one-half years.

The testimonial evidence presented at the hearing of the petition and cross petition was, we acknowledge, equivocal as to whether Gina Moorehead's express renunciation of her child custody rights was fully voluntary. Mrs. Moorehead cannot deny, however, that on February 2, 1991, she did in fact express a willingness to relinquish her right to physical custody of the two children and that she did so in a written document drafted by her own hand. We cannot accept the hypothesis that Mrs. Moorehead's written abdication from her role as custodial parent was the product of some sort of mental or physical duress. More accurately, we find that if Mrs. Moorehead's surrender of custody was the product of any

sort of "duress", it was the sort of "duress" which is naturally felt by any single parent required to cope with two young children while holding down a full-time job.

Mr. Moorehead testified that on Saturday, February 2, 1991, one day before he was supposed to visit with the children, Mrs. Moorehead appeared at his house, declaring that she "couldn't handle them anymore [and] that she didn't want them anymore". According to Mr. Moorehead, Mrs. Moorehead told him that "[he] could have them", that he could have "full custody" and that "she couldn't put up with them anymore". Mr. Moorehead said that his wife then told him that she wanted "reverse custody". At Mr. Moorehead's suggestion, Mrs. Moorehead expressed this desire to transfer custody in the written document previously referred to.

Mrs. Moorehead's testimony that her behavior on February 2, 1991, was attributable to "cabin fever", that is, to the sensation of stress intrinsic to her role as a single parent, has the unmistakable ring of truth. Her testimony that Mr. Moorehead physically prevented her from leaving his house and in effect threatened to hold her captive unless she relinquished custody, does not. We find, in other words, that the weight of the evidence establishes that on February 2, 1991, Mrs. Moorehead felt a strong psychological need to be free of her children for at least that day, and that it was this subjective emotional need or desire on her part, rather than the objective exercise of any duress on the part of Mr. Moorehead, which induced her to draft and to sign the document acknowledging her willingness to transfer physical custody of her two children.

Dennis Moorehead commenced the present proceeding almost immediately after the extra-judicial transfer of custody which had occurred on February 2, 1991. After a hearing, the court awarded physical custody to Mr. Moorehead. The court, in its decision, suggested that it had been swayed by "testimony that the children seem to be much healthier, better disciplined and in a more regular lifestyle now that they are living with their father". The court also expressed concern about proof which tended to show that Mrs. Moorehead may have failed appropriately to respond to certain accidental injuries suffered by the children. The findings of fact in the hearing court's decision are entitled to deference (e.g., *Matter of Irene O.*, 38 NY2d 776), and we decline to disturb them on this appeal.

The single rule of law which applies in this case is the

familiar one which binds both this Court and the Family Court to make whatever custody order would be in the best interests of the two children *(e.g., Eschbach v Eschbach,* 56 NY2d 167; *Friederwitzer v Friederwitzer,* 55 NY2d 89; *see also, Matter of Radford v Propper,* 190 AD2d 93). On appeal, both parties marshal the evidence in an attempt to demonstrate their own superiority as parents. We find that neither one has succeeded in this endeavor, because both are equally fit. We also conclude that where, as in the present case, the evidence supports the conclusion that the two parties love their children equally and are equally able to care for their children, the nature of the children's "best interest" must be determined not by the futile method of enumerating and contrasting the various shortcomings of each parent, but rather, by considering the importance of a value which is of central importance in disputes of this nature: stability.

"Where there is no indication that a change in custody will result in significantly enhancing a child's welfare, it is generally considered in [the] best interest [of the child] not to disrupt [the child's] life" *(Pawelski v Bucholtz,* 91 AD2d 1200, 1201; *Matter of Garcia v Doan,* 132 AD2d 756, 757). In other words, the maintenance of the status quo is a positive value which, while not decisive in and of itself, is entitled to great weight *(see, e.g., Matter of Nehra v Uhlar,* 43 NY2d 242, 251; *Matter of Sullivan v Sullivan,* 190 AD2d 852; *Matter of Krebsbach v Gallagher,* 181 AD2d 363; *Robert C. R. v Victoria R.,* 143 AD2d 262; *Richman v Richman,* 104 AD2d 934). " 'Stability of the child's environment and a reluctance to uproot [the child] from familiar surroundings, quite properly is a relevant and important consideration where the custody dispute is between parents' " *(Matter of Golden v Golden,* 95 Misc 2d 447, 449, quoting from 2 Foster-Freed, Law and the Family New York § 29:5, at 510).

As noted above, the younger of the parties' two children, who was born in 1989, was one and a half years old when the parties separated, and two years old when, in February 1991, Mrs. Moorehead yielded custody. This boy, now four and a half years old, has thus lived most of his life with his father. If the 1991 de facto transfer of custody had been accomplished improperly, by kidnapping or "self-help", for example, then there might be valid social reasons for discounting the importance which would otherwise ascribe to the maintenance of stability in the child's life *(cf., Matter of Nehra v Uhlar,* 43 NY2d 242, *supra).* However, as outlined above, this child's current custody status, as well as that of his sister, was

brought about by the voluntary, albeit precipitous decision of the mother, and we therefore conclude that there are no social or legal reasons not to give substantial weight to the interest which both children have in the maintenance, rather than the disruption, of the status quo.

This is not to say that a long-lasting custody arrangement may not be disrupted where it is possible to conclude that such a disruption would serve the best interest of the child. Stability is important, but not decisive. If it were possible to say that Mrs. Moorehead loved her children more than Mr. Moorehead, that she was better able physically or financially to care for them, or that the two children themselves fared better while in her custody than while in that of Mr. Moorehead, then the result might be different. However, we have examined all of the relevant factors, including the evidence as to the environment furnished in each of the parties' homes *(e.g., Eschbach v Eschbach, supra; Matter of Krebsbach v Gallagher, supra)*, the evidence as to the parties' relative financial prosperity *(e.g., Eschbach v Eschbach, supra; Matter of Krebsbach v Gallagher, supra)*, and the evidence as to the parties' relative ability to provide for the physical, intellectual, and moral welfare of their children *(e.g., Eschbach v Eschbach, supra; Porges v Porges,* 63 AD2d 712), and can point to nothing upon which to base a conclusion that the children would be better off living with their mother.

In sum, we think that, all other factors being equal, the Family Court's determination should be upheld in the interest of avoiding disruption. "Because there are no countervailing circumstances that would warrant a change in the custodial arrangement that has existed for the past [two and a half] years, we find that the trial court's determination was proper" *(Zucker v Zucker,* 187 AD2d 507, 508), and the order appealed from is affirmed. Thompson, J. P., Bracken and Copertino, JJ., concur.

Miller, J., dissents and votes to reverse the order appealed from and to remit the matter to the Family Court, Putnam County, for further proceedings, with the following memorandum, with which Pizzuto, J., concurs: Measured by the most liberal standards governing determinations of "voluntariness," the mother's actions on February 2, 1991, fail to support the majority's conclusion that she voluntarily transferred custody of her two infant children by a handwritten note, particularly under the circumstances of its execution. The note simply read:

"Dennis Moorehead has reverse custody (all visitation, etc.,) included of our children as of 2/2/91.

"Gina Moorehead".

Moreover, my review of the record fails to reveal the "evidence" referred to by the majority of several factors it relies on in support of the Family Court's custody award to the father. Indeed, the record is devoid of evidence regarding the parties' relative ability to provide for the physical, intellectual, and moral welfare of the children, or even their relative financial circumstances. Therefore, I would remit the issue of custody to the Family Court for an appropriate, *full and complete,* hearing on custody, wherein a Law Guardian should represent the children and assure that essential evidence will be adduced.

The record reveals that *before* Mr. and Mrs. Moorehead separated, the father spent more and more time away from home, and increasingly spent the night with "friends". When, in July 1990 the father moved in with his girlfriend, he agreed to have the children remain with their mother, and at no time before February 1991 did he seek custody of them. After his departure, between July 1990 and September 1990 he saw the children only two or three times a month. It was only in September 1990 that the father began to take the children overnight for visitation—although the visits were scheduled for every other weekend, and were not infrequently canceled by him. The record further demonstrates that the father gave the mother little or no financial support from October 1990 to January 1991. It was during this period that the father quit his job with the Putnam County Sheriff's Office because he "didn't like [it]". Although he subsequently enrolled in a course training to be an emergency room technician, he later dropped out of that program as well. Meanwhile, the mother worked full-time as a secretary, relying on her modest salary and help from her own father for the support of her children.

On January 3, 1990, the mother obtained a temporary order of support, directing the father to pay her $154 a week in child support. Notwithstanding this order, the father paid her only $160 during the entire month of January 1991. The mother testified that she was already financially and emotionally drained when the father called to cancel once again his overnight visitation with the children scheduled for February 2, 1991. At her wits' end, the mother drove the two children to their father's home and demanded that he "take them for the

night like [he was] supposed to"—that, indeed, he "take some responsibility" as the children's father, because she couldn't "do it all" herself. The father in essence refused to accept the children unless the mother wrote a note granting him "reverse custody"—which, in anger and exasperation, she did. On the following day, the father, invoking the note, refused to return the children, and demanded that she turn over their clothing (which, anticipating only an overnight stay, she had not brought with them). Immediately thereafter, and just before the final support proceeding was scheduled to come on for a hearing, the father sued for custody, and simultaneously filed a child abuse complaint against the mother. The ensuing child protective investigation was dismissed as without foundation—although it resulted for a time in the mother's being restricted to limited, *supervised,* visitation with her children.

It is well established, as the majority notes, that where a de facto transfer of custody has been accomplished "improperly" (e.g., by kidnapping or "self-help"), "there might be valid social reasons for discounting the importance which would otherwise [attach] to the maintenance of stability in the child's life *(cf., Matter of Nehra v Uhlar,* 43 NY2d 242, *supra)." (Supra,* at 519.) There can be no serious question that the removal of these children from their mother was "improper": the father abandoned his family, moved in with his girlfriend, visited his children infrequently, did not exercise visitation when he was scheduled to, provided essentially no financial support for seven months, and then, when his wife was strained to the breaking point, pressured her into granting him "reverse custody." That the father's abandonment of his family, and his failure to assume responsibility for the children's support or even for their psychological and physical needs, were responsible for the mother's exhaustion and frustration is a fact entirely ignored by the majority. Under these circumstances, the mother's relinquishment of her children cannot be considered "voluntary." Indeed, it is clear that the mother did not understand or intend that the note that she hastily scrawled and signed, at the insistence of her husband, did in fact transfer permanent custody to him, because, among other things, she dropped the children off unequipped for anything but an overnight stay, and she endeavored on the following day to pick them up again.

The majority's conclusion that the mother transferred custody voluntarily ignores the clear mandate of the Court of Appeals and the Legislature that special scrutiny be accorded all agreements between spouses, to ensure that they have

been entered into with the utmost of good faith *(see, Christian v Christian,* 42 NY2d 63; *Golding v Golding,* 176 AD2d 20; Domestic Relations Law § 236 [B] [3]). Agreements to transfer custody clearly are entitled to the highest possible degree of scrutiny. The majority acknowledges that the testimony as to the voluntariness of the mother's renunciation of custody is "equivocal". Indeed, that transfer would not satisfy even the minimal requirements of ordinary contract law as a voluntary good-faith transaction.

It is worthy of note that in routine adoption proceedings, a natural mother has 30 days to change her mind *(see,* Carrieri, Practice Commentaries, McKinney's Cons Laws of NY, Book 52A, Social Services Law § 384, at 522; *Matter of Ruth "J" v Beaudoin,* 55 AD2d 52; *Matter of Janet G. v New York Foundling Hosp.,* 94 Misc 2d 133; *Matter of Natural Parents of "Nicky" v Dumpson,* 81 Misc 2d 132). Yet the majority will not allow this mother to reconsider her rash gesture, despite her fitness as a parent, and despite the fact that she was driven to her desperate act by the husband who is now profiting by it.

Were this record not lacking in other respects, I would urge that physical custody should be restored to the mother, because she was the parent with whom the children were originally placed by mutual consent *(see, Eschbach v Eschbach,* 56 NY2d 167; *Matter of Sullivan v Sullivan,* 190 AD2d 852; *Matter of Schouten v Schouten,* 155 AD2d 461, 462-463), because she had been, throughout the children's life, the constant, nurturing parent, and because the father had defied legal process, in, for example, failing to pay court-ordered support *(see, Friederwitzer v Friederwitzer,* 55 NY2d 89, 94). Moreover, the Probation Department deemed the issue of which parent should have physical custody too close to call, and the court-appointed Law Guardian emphatically urged that the children be returned to their mother. It should be noted that the mother has apparently taken advantage of the liberal visitation accorded her by the Family Court's order, and she remains a strong presence in the children's lives.

However, in view of the Family Court's failure to elicit evidence in regard to factors critical to the determination of custody—including the psychological bonding of the children, and the parties' relative ability to provide for their moral, educational, intellectual, and financial wellbeing *(see, Koppenhoefer v Koppenhoefer,* 159 AD2d 113; *Porges v Porges,* 63 AD2d 712, 713)—I would remit for a new custody hearing. At that hearing, although the children's own preferences are not

controlling, they are now of an age when they may articulate their wishes, which should be weighed in the balance (see, e.g., *Klat v Klat,* 176 AD2d 922). Because I agree with the majority's concern that the stability of a custodial arrangement of such significant duration not be lightly disturbed, I would not transfer the children's custody without considering their present psychological, intellectual, and social needs. Therefore, the children's best interest requires that a new hearing be held, exploring for the first time the essential factors relevant to their custody.