Matter of W.S. v B.S. (2007 NY Slip Op 52398(U))

[*1]

Matter of W.S. v B.S.

2007 NY Slip Op 52398(U) [18 Misc 3d 1104(A)]

Decided on December 17, 2007

Family Court, Nassau County

Singer, J.

Published by New York State Law Reporting Bureau
pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on December 17, 2007

Family Court, Nassau County
In the Matter of a
Proceeding AFTER HEARING Under Article 6 of the Family Court Act, Petitioner, W.S.
against
B.S., Respondent. B.S., Petitioner, v W.S., Respondent.
B.S., Petitioner,
against
W.S., Respondent.
V-0000-00/00

Conrad D. Singer, J.
The matter before the Court concerns custody of two children, M., age 13 (d/o/b
00/00/00) and L. age 11 (d/o/b 00/00/00). M. and L. are the biological children of the
parties herein, father W.S. and mother B.S. The current proceedings were commenced when the
father filed a petition pursuant to Article 6 of the Family Court Act seeking a modification of an
Order of Custody of the children after the mother relocated beyond the radius clause in their
divorce stipulation. The mother subsequently filed her own petition.
[*2]
The mother was originally represented by Heath S.
Berger, Esq. of Steinberg, Fineo, Berger & Fishcoff, P.C. That firm was relieved and the Court
appointed the Nassau County Legal Aid Society to represent the mother. There came a time that
Legal Aid requested to be relieved. In response to such Adam Small, Esq. was appointed for the
mother. The father has been represented by Ilene J. Behar, Esq., of Hoffman & Behar. William
Sheekutz, Esq. was appointed law guardian.
The hearing on the issue of custody commenced on February 9, 2007 and ended on October
25, 2007 with multiple trial dates in between. There were also two in camera interviews
with the subject children on April 18, 2007 and November 2, 2007.
BACKGROUND
Pursuant to a contented- to stipulation and the Judgment of Divorce the
parties were divorced in 1998. As per the terms of their stipulation, the mother had sole custody
of the two children and the father had certain rights of visitation. One provision of their
stipulation was that the mother could not relocate outside of a fifty (50) mile radius with the
children. Each party became involved with other long-term partners and each has had other
children. The mother and her paramour, Mr. A.T., have been together approximately nine years
and have two children out of wedlock. The father is remarried to T.S. and together they have one
child. Each family unit lived in various areas of Queens and Long Island over the years until the
mother moved, with her paramour, the subject children and her other two children to
Pennsylvania on or about August, 2006. It is this move that has spurred the current litigation.
On September 15, 2006 the father filed a petition for custody of the two subject children.
Despite being properly served with the custody petition, the mother did not appear in Court for
over three court appearances. On the fourth court appearance, on December 21, 2006, the mother
did appear in Court that morning, but then did not return to Court that afternoon, despite being
told to do so by the Hon. Merik Aaron's court attorney. The mother claims her legal aid attorney
informed her she could go home. As a result of her failure to return to Court on the afternoon of
December 21, 2006, and the inability of the Court to reach her by telephone, Judge Aaron
transferred custody of the subject children to the father. The father made arrangements for that
order to be enforced in Pennsylvania, and on the next day, December 22, 2006, he obtained
physical custody of the children in Pennsylvania and brought them to his home in New York.
They have lived with him since that time.
During the trial each party called three witnesses. The father called himself, A.T. and Dr.
Peter Favaro. The mother called herself, Probation Officer Sharne Wolfolk and T.S..
SUMMARY OF
TESTIMONY
PETITIONER'S CASE
W.S.
The father testified briefly about the terms of his divorce and then about the
mother's multiple residences since the divorce. According to his testimony the mother moved
from Floral Park to Long Beach, then from one location in Long Beach to another location in
Long Beach, then to Atlantic Beach before relocating to Pennsylvania. These moves took place
within a four (4) year period of time, and the children were enrolled in the Floral Park, Long
Beach, Lawrence, and Oley Valley school districts, respectively, during this time. He testified he
was given no advance notice of the [*3]move to Pennsylvania
which was over one hundred and forty miles from his home on Long Island. The father denies
consenting to the move and confirmed the mother did not seek Court approval. After filing his
custody petition, the mother did not show up for three court appearances. She then appeared on
the fourth date but left in the afternoon. He gave the Court the mother's cell phone number but
the mother's phone either was not on or she was not answering it. Judge Aaron then issued a
temporary order of custody in favor of the father, which he brought to Pennsylvania and, with the
assistance of the sheriffs there, obtained physical custody of his children. After bringing the
children home, the father enrolled them in school and purchased new wardrobes for them. The
children are involved in school activities including musical instruments. Mr. S. testified that the
mother obtained visitation, but despite there being no provision for telephone contact, he allowed
telephone contact anyway. However, these telephone conversations would often upset the
children, so Mr. S. would listen in and also record the conversations. Mr. S. claims he informed
the mother she was being recorded and asked her not to discuss the litigation with the children.
The children were brought to a therapist and also to Dr. Peter Favaro for evaluation. Mr. S. then
indicated to the Court what visitation he thinks the mother should have should he obtain custody,
and, in the alternative, what visitation he would like should Ms. S. obtain custody.
On cross examination, Mr. S. testified he paid Dr. Favaro five thousand dollars for services
including the possibility of testifying in court. Under the original divorce stipulation, Mr. S.'s
visitation was twice weekly for a few hours each night. He did not have weekend, summer or
vacation visitation at that time. At one time he brought a petition for visitation when Ms. S.
moved from Floral Park to Long Beach. She did not inform him of where she was living in Long
Beach and he went a period of time without seeing the children. The father testified the mother
has always been a very good parent, a very loving parent and the children love her very much.
Under further questioning he referred to the mother as "a great mother" as she encouraged them
to thrive, got them involved in playing musical instruments and helped them become educational
standouts. He acknowledged that prior to the move to Pennsylvania, he had no complaints at all
with the mother's parenting, though he wanted an expanded relationship with the children.
Regarding their happiness he said "They were happy. I wasn't happy with the living arrangements
but they were happy." T. 2/9/07, p. 44, lines 13-14. Mr. S. further acknowledged that his original
intent in bringing a petition to the Court after the Pennsylvania move was to have extended
visitation. When asked if he wanted custody or expanded visitation he responded "What I want is
the best for the children, that's what I'm looking for." T. 2/9/07, pp 47 and 48, lines 25 and 1.
Upon questioning by the law guardian, the father recounted an incident with the mother's
paramour Mr. T. where, during a pick up of the children, Mr. T. drove directly at Mr. S.'s parked
car and slammed on the brakes, almost hitting the car. Mr. T. began yelling at Mr. S., demanding
child support money. The children witnessed this. He also testified to hearing the children on the
phone with their mother and their mother encouraging the children to tell the judge they want to
live in Pennsylvania.
During redirect, Mr. S.'s contact with Dr. Favaro was explained further. He said "The
purpose of going to Peter Favaro was, my main concern was if I was making the right decision
based on what the children wanted of whether they wanted to be with me or their mother...I
wanted a further explanation if I was making the right decision..." T., 2/9/07, p. 54, lines 12-15,
18-19. Mr. S. further testified that while the visitation periods in the divorce stipulation were
limited to two [*4]week nights, the stipulation also indicated
"liberal visitation". Also, Mr. S.'s parents were providing child care and he saw the children
often. The father then expanded on the incident in 2002 when the mother moved from Floral
Park to Long Beach but did not inform him. He stated he originally filed papers in Supreme
Court but the matter was referred to Family Court. In Family Court the mother then filed her own
papers stating she found a crack vial in her daughter's coat and that Mr. S. was a crack addict.
Her allegations resulted in supervised visitation and multiple drug tests. The end result of those
proceedings was visitation was reinstated in its original form. Mr. S. testified that he and Mr. T.
have had verbal confrontations where Mr. T. has called Mr. S. a bad person, stated that Mr. T. is
the one raising his children, stated that he (Mr. S.) commits fraud, and stated that his children
will look at him differently. These conversations happened more than once.
The Court had the opportunity to observe Mr. S. under direct and cross examinations, as well
as during the course of the hearing. The Court found Mr. S.'s testimony credible and
forthcoming. Nothing that occurred later in the trial in any way impugned Mr. S.'s credibility.
The next date for testimony was May 18, 2007. Adam Small, Esq. appeared on behalf of Ms.
S.. After the February 2, 2007 court date, Mr. Berger was relieved by Ms. S.. Ms. S. was then
appointed legal aid who then asked to be relieved. Mr. Small was appointed. While on the record
on May 18, 2007, Mr. Small acknowledged he was not present for the first date of testimony. The
Court was prepared to declare a mistrial and start the hearing over. Mr. Small indicated that was
not necessary and he was not asking for a mistrial. The case therefore continued.
Dr. Peter Favaro
Dr. Peter Favaro testified about his lengthy and impressive credentials. Without objection, he
was qualified as an expert in custody disputes and child psychology. Dr. Favaro was contacted by
Mr. S. in January of 2007 and was retained for five thousand dollars. When asked what he was
retained for, Dr. Favaro stated "Mr. S. first and foremost wanted my opinion as to the
psychological and emotional well being [sic] of his children, and whether or not a professional
person thought that it was in their best interests for the children to continue living with him while
he was struggling through some conflicts with the mother of the children." T. 5/18/07, p. 18,
lines 9-14. Dr. Favaro never spoke with Ms. S.. Dr. Favaro stated that Mr. S. fared well during
psychological testing except for seeming to place himself in a more favorable light, but qualified
this by stating that this was typical in high conflict family law matters. Regarding the children,
Dr. Favaro was quite impressed with them and felt they were sound psychologically and
emotionally. The children informed him they wish to live with their mother. It was Dr. Favaro's
opinion that these children would thrive with either parent, though they might not find living
with their father "ideal".
The Court found Dr. Favaro credible, though the bulk of his testimony was of limited
relevance. He did confirm the father's stated purpose of only seeking what was best for his
children. That was the father's "primary concern". He also claimed to have heard tapes of the
children's phone conversations with their mother where the mother had put "a substantial amount
of pressure" on the children to say to others they didn't want to live with their father. However,
due to Ms. S.'s failure to take part in the evaluation (which was her absolute right), the majority
of the information Dr. Favaro had was based on what Mr. S. alone told him. Without having Ms.
S. state "her side" to Dr. Favaro, his opinions on all issues other than his evaluations of the father
and children themselves is of questionable use. That being said, the Court hopes the parents
heard Dr. Favaro's sobering [*5]discussion on the effect
high-conflict parenting situations have on children, particularly young women, including higher
risk of emotional difficulty, educational difficulties, substance abuse problems and teenage
pregnancy. A.T.
The father's next witness was A.T., the paramour of B.S.. On direct examination Mr. T.
testified he and Ms. S. purchased the Pennsylvania house at the end of July, 2006. Though the
deed and mortgage are in Ms. S.'s name, Mr. T. said he paid the down payment. He described his
employment as vice president of sales for a specific company. When asked about his income he
first stated "A base salary of under $100,000." T. 5/18/07, p. 64, line 17, but then stated his base
salary was $75,000. He doesn't earn commissions, but expects bonuses. Ms. S. does not work
outside the home. Mr. T. then testified about the multiple residences from Floral Park to Long
Beach to Atlantic Beach to Pennsylvania. He indicated he and Ms. S. never married, by choice.
They have lived together for about four years. Mr. T. refers to the subject children as his own
children, repeatedly, but acknowledges he is not the biological father. The children sometimes
call him "Dad" or "Daddy" and he does not discourage this. He is honored by it. Mr. T. described
himself as a disciplinarian but denies any corporal punishment. Ms. S. is his "soulmate". Mr. T.
denied having an altercation with Mr. S. where he drove up to him, slammed on the brakes and
demanded child support money. There was an incident in a doctor's office where he became upset
but he did not raise his voice or get into anyone's face. He also acknowledges becoming loud
with the law guardian in this case, but not abusive. Further, he acknowledged calling Mr. S. a bad
person and leaving a message on an answering machine warning the children not to let Mr. S.
give them drugs. He told others, but not the children, he is a better father than Mr. S.. He
continued to refer to the children as his children:
Q. You keep referring to them as your children. They are not your children.
A. Who elected who said that?"
Q. They are not your children, are they sir?
A. They are my children. I have been with these kids for eight years, for the last eight
years I have provided food, clothing, shelter, vacation, camp, karate, chorus, instruments. You
want me to continue, because if I think there have probably another [sic] five hundred things, and
if that is not what a nurturer and someone who cares for children does...
T. 5/18/07, p. 84, lines 12-22.
On cross examination Mr. T. testified he and the mother have been in an relationship for nine
years and has been living with the mother and the children for four to five years. His relationship
with M. is "phenomenal, tremendous". As an example, he helped M. get over her fear of dogs.
He taught L. how to swim, how to ride a bicycle, about good and bad music. They discussed the
news and music together, and he would regularly bring both children to, and pick them up from,
school. On occasion he would assist with homework, though Ms. S. did that most of the time
since she was a teacher. L. was involved in a number of school programs including Odyssey of
the Mind, student council and violin lessons. While living in Long Beach, Mr. T. got both girls
involved in karate. L. is an exceptional student and Mr. T. and Ms. S. had her tested to determine
how gifted she was. Mr. T. paid for these tests, and it cost about ten thousand dollars.
[*6]
Upon questioning by the law guardian (on the next court
date), Mr. T. acknowledged Mr. S. is "100 percent the biological father". When asked what role
Mr. S. should play, he said: "Oh, any. I welcome any role that, you know, a father should play the
father role I play for my two children, Sophie and J.." T. 7/26/07, p. 7, lines 19-21.
On re-direct examination, Mr. T. stated he, personally, never informed Mr. S. of the
following things: that he taught L. how to ride a bicycle, concerts that the children participated
in, about the Odyssey of the Mind program, that he took L. for psychological testing regarding
her educational abilities, of whether the children should attend karate and when the karate
sessions were or any other activities. He did believe Ms. S. talked to Mr. S. about some of the
activities. He spent part of Father's Day, 2007 with the children. He has called CPS on the father
three times since December 21, 2006 when custody was transferred. Mr. T. acknowledged that
Mr. S.'s rights are superior to his.
The Court had the opportunity to observe Mr. T. on three separate hearing dates. The Court
found Mr. T. to be of questionable credibility. The Court believes that Mr. T. was untruthful on a
number of occasions. He was evasive, belligerent and rude. Despite repeated directives to listen
to, and only answer the question asked, he continued to give non-responsive answers, instead
choosing to state things he wanted say. His testimony spanned three court dates and despite being
told on each court date repeatedly to confine his answers to the questions asked, he refused.
After Mr. T.'s testimony concluded, petitioner rested.
RESPONDENT'S CASE
B.S.
Ms. S. testified she moved to Pennsylvania in early August, 2006. She stated the
reasons for the move were:
I wanted to provide all my children with a better quality of life. I wanted to be able to
give all their own rooms. I wanted to make sure the schools system was full of activities and
programs for them. And I wanted to make sure they had a yard and just a beautiful community
where they could have friends and I don't have to worry about them visiting their friends and
basically just wanted to give them a [better] childhood.
T. 7/26/06, p. 25, lines 2-9.
She first told Mr. S. she wanted to move in May, 2006. His only expressed problem was
having to drive for visitation, so she agreed not to make him do the driving. They had
approximately three phone conversations about the relocation. His first reaction was he was
happy for her. The second conversation, when she told him they had bought the house, he was
nervous about the driving. Prior to that she had asked him to increase child support because she
felt she could no longer afford New York. He refused. At one point they discussed making the
move and visitation arrangements legal and Mr. S. was going to fax her papers, but never did.
Ms. S. agreed she would drive the children most of the way for visitation and Mr. S. would only
have to drive about thirty-three miles. The children lived with her from birth until December 21,
2006. Prior to December 21, 2006 she was primarily responsible for the children's medical and
educational needs. She would inform Mr. S. of medical and educational issues. Regarding school
activities, she would [*7]have the children call him and inform
him. They shared responsibility for purchasing clothing, with Mr. S. taking the children shopping
at the beginning of each school year and Ms. S. taking care of the clothing requirements during
the year. Ms. S. purchased the school supplies. The children played musical instruments as well.
They enjoyed their school and friends in Pennsylvania and were doing very well in school. Ms. S.
testified she always stressed the importance of education to her children. From her perspective,
Mr. T. and the subject children have a wonderful relationship, as do the subject children with
their siblings who are the biological children of Ms. S. and Mr. T.. Since living with Mr. S. the
children have gotten sick often, requiring antibiotics, and Ms. S. could not remember ever having
to give them medication previously. On the December 21, 2006 court date Ms. S. claims her then
legal aid attorney told her she could go home after the lunch break, which is why she left.
On cross examination Ms. S. testified that she has a number of family members who live in
New York, including her mother and siblings. When Ms. S. was living in New York with the
children, they saw members of her family, including her mother often. During the time the
children were in Pennsylvania, no members of Ms. S.'s family saw the children. Mr. S. also has
family in New York, including his parents as well as two cousins of similar age to the subject
children with whom they are close and see often. Regarding court dates she missed, Ms. S.
testified she wanted to testify electronically for one and did not get notice of another. She denied
ever telling the children to tell the law guardian that they wanted to live with her. Despite the fact
that an affidavit she signed described the prior court proceedings as "comical" she claims that
was a word her lawyer chose and not her opinion.
The cross examination continued on the next court date. Ms. S. testified that after her legal
aid attorney told her she could go home on December 21, 2006, she did not confirm that with the
court attorney. She did not remember if, after leaving Court on that day, she left her cell phone on
or whether she had any messages when she returned home to Pennsylvania. Since 1998 to the
present time, the children have been in four different school districts. Ms. S. acknowledged never
seeking court approval to move to Pennsylvania but claimed she did discuss it with Mr. S. prior
to the relocation. She denied telling the children not to tell their father about the move. Regarding
the purchase of the new home, Ms. S. believes she went to contract and had a closing on the
same day. The house and mortgage are in her name alone. The children lived in Pennsylvania for
about five months. Ms. S. denied telling the father that if he wanted to visit with the children he
would have to drive part of the way. Despite signing an affidavit that referred to Mr. T. as
"volatile", she denied he was. She further denied a number of allegations concerning Mr. T.
threatening Mr. S.. However, Mr. T. has been "more a father" to the children than Mr. S. ever
was. If Ms. S. obtains custody of the children, she believes Mr. S. should have alternate weekend
visitation. Upon further questioning, Ms. S. denied putting pressure on the girls to say they
wanted to live with her but then testified she couldn't recall the content of some of the phone
conversations she had with them, including whether she told them to write their feelings down on
paper. The issue of Father's Day, 2007 was raised again, and Ms. S. claimed Mr. S. had the
children for "half the day" because he got them at 5:00 p.m. The Court the inquired about
previous Father's Days:
THE COURT: What years has he not had the girls for Father's Day?
THE WITNESS: It is not in the divorce agreement.
THE COURT: What years has he not had the girls for Father's Day?
[*8]
THE WITNESS: He never had them. He never
asked.
THE COURT: Not if he asked. Has he ever had them for Father's Day?
THE WITNESS: No.
T. 8/22/07, p. 36, lines 12-22.
Ms. S. acknowledged that during a previous proceeding, a number of years ago, in
response to Mr. S. claiming his visitation was being interfered with, she accused him of being a
drug user. This resulted in Mr. S. having supervised visits for a period of time. However, Ms. S.
acknowledged that she made no allegation about his drug use until he brought her to Court
alleging interference with visitation. She stated she kept Mr. S. informed of the children's events.
She testified she had a tape recording of Mr. S. acknowledging that he agreed to let her move to
Pennsylvania but then changed his mind. However, she did not bring that tape to Court during
this (or any other) Court date. Ms. S. was unwilling to state Mr. S. was a good father. "Based
upon past experiences, I would say he has not really been in their lives long enough to make that
assumption." T. 8/22/07, p. 56, lines 11-13.
On being questioned by the law guardian, Ms. S. said that Mr. T. was not the children's "real
father" but he had more quality time with them "by choice". The children have reported problems
to their mother since living with the father, such as strep throat, a viral infection, "chronic
symptoms" and trouble using the bathroom. They also report problems with Mr. S.'s wife Tanya
who is "disrespectful" to them and is also "embarrassing". Tanya doesn't treat her baby properly,
doesn't feed him properly, doesn't care for him properly. She also dresses inappropriately,
including walking around the house in a thong. If given custody, the mother said she would home
school L..
Upon redirect, which commenced on a new court date, Ms. S. claimed the children told her
that since the last court date Mr. S. had told the children if they write down the reasons why they
wanted to live with their mother, he would let them do so. The children "frantically" started
writing the letters, but then Mr. S. reportedly told the children to forget about it, he was "just
feeling emotional".
The Court had the opportunity during direct and cross examinations, as well as during the
course of the hearing, to observe the demeanor of Ms. S.. The Court finds Ms. S.'s testimony
barely credible. Her statements were self-serving in the sense that she accepted blame for
nothing. Missing court dates, visitation problems, Father's Day issues all were someone else's
mistakes, not hers. Her testimony tended to contradict itself and her memory was selectively
porous at times. The Court had a hard time believing much of what she said.
Probation Officer Sharne
Wolfolk
Officer Wolfolk appeared via subpoena from the respondent. She has been a probation
officer for three years and is currently in the criminal division. Prior to being in the criminal
division she was in the family division where she did investigations in custody, visitation, PINS
and juvenile delinquency matters. She has completed approximately three hundred Investigation
and Reports ("I & R"). The parties in this case signed a stipulation, dated February 9, 2007,
agreeing that the Nassau County Probation Department would perform an I & R in this case. The
stipulation was moved into evidence without objection. As part of her investigation, she met with
the parties, Mr. T., MS. T.S. and the children. She also performed "local criminal clearance
investigations" and local [*9]CPS investigations on the adults.
None of the investigations indicated any criminal or CPS history for any of the people
investigated. Officer Wolfolk testified that Mr. S. told her he would have probably consented to
the relocation had Ms. S. discussed it with him first. He also told her the children were angry at
him for removing them from their mother's custody. Ms. S. said Mr. S. had a drug problem
during the marriage. Mr. S. denied this. The children told Officer Wolfolk they were
uncomfortable with T.S., that she dressed inappropriately by wearing a t-shirt and thong, and she
would yell at them. The children have a good relationship with Mr. T. and they miss their
siblings J. and S.. Officer Wolfolk did not believe, based upon her investigation, Mr. T. was a
danger to the children. A home study was performed in Pennsylvania and the home was
adequate. The children indicated they would like to return to the custody of their mother and
have visitation with their father.
During cross examination Officer Wolfolk stated she had never seen Ms. S.'s home in
Pennsylvania but that she personally saw Mr. S.'s home and it was sufficient. Officer Wolfolk
only spoke with Mr. T. for one half hour and never saw him together with Ms. S.. She did see
Mr. S. and T.S. together and believed they had a good relationship. Officer Wolfolk spoke to the
children, together, for approximately fifteen minutes and didn't speak to their teachers, therapist
or grandparents. Neither Mr. T. nor Ms. S. were able to have criminal clearances performed in
New York State (as opposed to Nassau County only) because they did not have themselves
fingerprinted. Therefore, their criminal history in New York is not known. Officer Wolfolk
agreed that Mr. S. never said he definitely would have consented to the Pennsylvania move if
told beforehand, but that he would have considered it. According to Officer Wolfolk, probation
did not find any compelling reason to change the original custody order granting the mother
custody.
During questioning by the law guardian, Officer Wolfolk clarified the criminal clearance
testimony. She testified that Mr. T. and Ms. S. could only have local criminal clearances
performed since she never received their fingerprints. She did not know why she never received
their fingerprints. She denied that the children were "extremely unhappy" living with their father,
but would prefer to live with their mother. She did not believe the children were coached when
they spoke to her.
During redirect, Officer Wolfollk stated that Ms. S. told her she tried to contact the person
who does the fingerprinting more than once, but was never able to get in touch with him. Officer
Wolfolk eventually learned that the person who did the fingerprinting had retired and "no one
was doing fingerprinting at the time." The children were "stressed" because they were having
trouble making friends at school and they missed their mother and siblings in Pennsylvania.
The Court notes that Officer Wolfolk's information was current as of May, 2007. The Court
found Officer Wolfolk credible and did not believe her to be biased toward or against either
party.
Tanya Berman Said
(The Court shall refer to this witness as "MS. T.S." to differentiate her from "Ms. S.", the
respondent). T.S. married W.S. in 1999. The children learned they were married after the
ceremony. They were married in Las Vegas, not necessarily on a whim but it wasn't planned. She
didn't remember the children's reaction to the news, but noted that they were young at the time.
She has one child with Mr. S., a boy who was fourteen months old at the time of her
testimony.She is a stay-at-home mother and has a housekeeper/nanny who started assisting her
when the baby was [*10]around one year old. The helper comes
in a couple of times per week and does cleaning and, when necessary, watches the child. But her
primary purpose is to clean the house. The helper never watches the subject children alone. Ms.
T.S. and Mr. S. separated for a period of approximately one year a number of years ago, but after
the marriage. "We just needed to just grow up a little bit. We got married pretty young, so we just
needed some time apart." T. 10/25/07, p. 78, lines 13-14.The separation was not the result of any
drug use by Mr. S.. Mr. S. saw a mental health provider, but it was her therapist and he came
along with her. She has introduced the subject children to others as her children and also as her
stepchildren. She has cursed in front of the children after being hurt. She also once called L. a
"bitch". It happened a few months after custody was transferred. The baby was cranky and Ms.
T.S. was driving L. somewhere but had to stop at a store to buy her pants. L. was insisting on
specific kind of pants and shoes. "And L. was just very rude to me, and it just happened it just
came out of my mouth. It's the first time and the only time and the last time I've ever called her
that." T. 10/25/07, p. 85, lines 15-18. MS. T.S. acknowledged it's not an appropriate way to speak
to a child. She testified that L. can be difficult: "She is a little genius. She's very smart and
sometimes she's a little smarter than I am when it comes to certain things and she's very quick
and she's she's a wonderful child . Sometimes our personalities just clash." T. 10/25/07, p. 86,
lines 12-15. MS. T.S. has not spoken to the children's teachers, guidance counselors or any
school personnel. She stated this was because Mr. S. did not want her to. Mr. S. disciplines the
subject children and does the cooking. The children tell her their mother is a better cook. She
bought some cookbooks to get better. She has not spoken to the girls about the litigation, or the
cost of Mr. S.'s lawyer. She admits the children have complained about the clothing she wears,
stating her cleavage shows too much and her skirt is too short. She denied ever walking around
the house in a thong. She was shocked when custody of the girls was transferred to Mr. S., and
acknowledged it wasn't something she necessarily wanted. Prior to the transfer of custody Mr. S.
was not "thrilled" with the visitation arrangements and wanted to see the girls more often. She
now spends more time with the girls than Mr. S., though he takes M. to school each morning and
takes L. to school some mornings. He cooks the girls' breakfast, makes their lunch and drives M.
to school "because she insists on being driven." He sometimes walks L. to school. Mr. S. returns
home from work between the hours of 5:00 p.m. and 8:00 p.m. Sometimes he works on
weekends, but does that when the subject children are with their mother. Ms. T.S. and Mr. S.
have lived in four different homes together since being married. The girls don't require help with
homework often because they are smart, but when they do she helps them. Originally, the girls
didn't like Merrick, but now they enjoy it. The girls appear happy to her. "They're happy. We go
shopping, we have lunch together, we eat dinner together as a family, and we all play with junior,
and they play with Chloe. Chloe is our dog. And they're smiling, they're happy." T. 10/25/07, p.
95, lines 22-25. MS. T.S. describes her current relationship with the girls as "very good."
During cross examination, Ms. T.S. testified she often walks L. to the bus stop, and that
when the girls come home from school they all prepare lunch together. Sometimes they prepare
dinner together, too. The girls will tell her what they want and they prepare it. When the girls are
not with their mother, Mr. S., Tanya and girls eat dinner together six nights a week. Mr. S.
sometimes does homework with them, and he tucks them into bed at night. They all go clothing
shopping together. When not with their mother, the girls see their cousins almost every weekend.
She and Mr. S. have attended the girls' concerts together. After calling L. a bitch, Ms. T.S.
apologized to L. "for the [*11]whole week."
During questioning by the law guardian, Ms. T.S. stated she believed the girls' biggest
problem with her was her cooking. They say it doesn't taste good. Maybe twice a week they have
disagreements. T. gives her son candy and soda at times and the girls tell her it's not appropriate.
The Court had the opportunity to observe T.S.'s demeanor and appearance during direct and
cross examinations. The Court found T.S.'s testimony quite credible, if not the most credible of
all the witnesses. She was the only witness who freely acknowledged her faults and mistakes.
She was very candid regarding her surprise when the girls suddenly came to live with her and in
admitting it wasn't what she wanted at the time. The Court believed her and did not believe she
tried to hide anything during her testimony and was never evasive.
IN CAMERA
INTERVIEWS
The Court performed two in camera interviews of the subject children. The
children were more expressive in the first interview than in the second. Their
disposition in the second interview was more negative. The Court will not reveal the substance of
these interviews, except to note that, as the law guardian repeatedly indicated during the trial,
they stated, emphatically, they wished to return to living with their mother.
DISCUSSION
If not for the children's stated desire to return to their mother, the Court's decision in this
matter would be simple and clear. Custody to the father and parenting time to the mother. The
Court believes the mother and her paramour have undermined the father's relationship with the
children and sees no reason why that would stop should she be the custodial parent. The father,
on the other hand, seems to put the children's best interests first and was willing to give up
custody for that reason. He would foster an ongoing relationship between the mother and the
girls. The Court is not convinced Ms. S. would reciprocate. As proof, Mr. T. has regularly and
publicly shown contempt for Mr. S. and Ms. S. has done nothing to prevent this from happening.
Father's Day is another example. When asked why Mr. S. did not have his children with him for
previous Father's Days, her response was that it wasn't in their agreement and he didn't ask. A
mother who wished to foster a healthy, loving relationship with the children's father would not
need to check (or rely upon) an agreement or be "asked" if the children should be with their
father, as opposed to her paramour, on Father's Day.
In essence, this is a relocation case. While it is different from most in that custody was
actually changed to the non-relocating parent prior to the trial, the analysis is the same. The issue
of relocation is to be considered depending upon the facts of the particular case and what is in the
best interests of the children. Tropea v. Tropea, 87 NY2d 727 (1996). In determining
whether to allow a relocation, the Court must consider a number of factors including, but not
limited to: the reasons in favor of and against the relocation, the quality of the relationships
between the children and the custodial and non-custodial parents, the impact the move would
have on the relationship and future contacts with the non-custodial parent, the extent to which the
children's and custodial parent's financial, emotional and educational needs will be enhanced by
the move, and the feasability of preserving a relationship between the children and the
non-custodial parent should the move be allowed. Id. The Court must determine, based
upon these and other factors, whether it has been [*12]established
by a preponderance of the evidence that the relocation would be in the children's best interests.
Id.
Regarding the financial, emotional and educational benefits of the move, the mother failed to
present even a scintilla of evidence, outside her own self serving statements, in support of the
notion that her new community was in any way superior to that which she left behind in New
York. For example, the mother repeatedly referred to a program L. is currently involved in called
Odyssey of the Mind. But it was never explained whether the school district in New York where
they previously lived offered any similar programs. To the contrary, the testimony all indicated
the children have always been excellent students and that they thrived in their schools in New
York and Pennsylvania. Aside from the one program, the Court learned nothing else about the
Pennsylvania school which would distinguish it from the school the children attended prior to
moving, or that they now attend in the Merrick School District on Long Island. The Court was
provided with no rankings showing where the Oley Valley School ranks in Pennsylvania, as
opposed to the rankings of any of the school districts the children have attended in New York.
The Court must also take into account the mother's and Mr. T.'s constant moving, resulting in
the children living in five different homes and four different school districts in a period of
approximately four years. See Persaud v. Persaud, 170 AD2d 763 (3d Dept. 1991). The
Court finds the constant moving relevant for a number of reasons. The first is that the moving
certainly added a degree of instability into these young girls's lives, jumping from residence to
residence, at a rate of about one per year. The second reason is that, despite the mother professing
her love for her current residence and community, the Court has no confidence that the pattern of
moving will stop. The third reason is the lack of explanation for, and the Court's inability to
understand, Ms. S.'s and Mr. T.'s motivation for moving the children into and out of so many
school districts when they are both such gifted students. Constantly having to change schools
certainly cannot be an enhancement of the educational experience. It is also a detriment to the
children's ability to obtain those skills needed to foster sustaining and long lasting friendships
with peers. In this line of reasoning, the Court is aware that, during the trial, it was pointed out
that Mr. S. also moved somewhat regularly in his life. However, during each of his moves, he did
not have custody of the subject children and was not uprooting them; just himself and his wife.
There is nothing in the record to indicate Mr. S. would introduce this level of instability into the
children's lives.
In Moorehead v. Moorehead, 197 AD2d 517 (2d Dept. 1993), the Court discussed
the importance of stability in children's lives. One of the holdings of that case was that
maintenance of the status quo in children's lives, while not determinative, is a factor to be
considered in custody matters. Unfortunately for these children, the status quo has been the
constant changing of their living arrangements and schools. The Court believes the father would
return stability of home and education to the children's lives.
Further, there was no evidence supporting the allegations that, for financial reasons, the
mother was unable to afford to live in New York. The mother and her paramour testified that Mr.
T. is the children's sole support in Pennsylvania. However, Mr. T. was vague about his income
and employment and provided no support for that about which he testified. Mehaffy v.
Mehaffy, 23 AD2d 935, 937 (3d Dept. 2005), ("Although the father testified that his
relocation plans were motivated by employment and financial considerations, he introduced no
financial documentation or evidence regarding his existing employment or financial status to
support finding a financial need [*13]to relocate and merely
asserted that he had unspecified construction work
"lined up in the new location"). The mother presented no evidence of what her
expenses were while living in New York, and what they are now that she lives in Pennsylvania.
The financial issue raises another concern for the Court. It was clear from the testimony of
Mr. T. that he was purposely evasive about his income, and it was equally clear that Ms. S. is
somewhat ignorant of the family's finances, perhaps purposely so. For reasons that were never
explained, despite the fact that Mr. T. is the family's only breadwinner, the family's assets
testified to have been placed in Ms. S.'s name, including the house in Pennsylvania as well as the
mortgage. Ms. S. and Mr. T. both testified that the move to Pennsylvania was necessary for
financial reasons, yet Mr. T. boasted to spending ten thousand dollars on psychological and
educational testing for L., not to mention over one hundred dollars per hour for horseback riding
on Father's Day. These are contradictory notions that lead the Court to believe Mr. T. was hiding
aspects of his finances and income. It appears to the Court that while the children were in the
S./T. house, it is possible that they were being raised in an atmosphere of financial deceit.
There was also no proof that the move would enhance the girls' emotional stability. Dr.
Favaro indicated, in his professional opinion, that the girls were currently in great emotional and
psychological health. He further testified they would thrive in either parent's home.
One issue the Court found extremely persuasive was the children's connection to family
members on both sides. Many live in New York while none live in Pennsylvania. This is an issue
of great importance that this Court will not overlook. See Meier v. Key-Meier, 36 AD3d 1001, 1003 (3d Dept. 2007)
(where relocation was denied because, among many other reasons "presence of extended family
on both sides here in New York..."), Heisler v. Heisler, 30 AD3d 321 (1st Dept. 2006) (where relocation
was allowed and the mother's "motivation to return to her roots in Baltimore, approximately three
hours away, where there is a family environment offering greater emotional and financial support
for raising the child, should not be discounted".), Zammit v. Novellino, 30 AD3d 534 ( 2d Dept. 2006) (where
relocation was disallowed because the father did not have a better job or home awaiting him in
new location and he "did not have a large extended family to assist him there, as he does in New
York."). Herein, the children have extended family, including grandparents on both sides, in New
York. As opposed to seeing them regularly when everyone lived in New York, Ms. S. testified
that during the five months the children lived with her in Pennsylvania they did not see members
of her extended family once. On the other hand, Mr. S. testified the children see their cousins,
with whom they are very close, every weekend they spend in New York. In Schreus v.
Johnson, 27 AD3d 654 (2d Dept. 2006), the Court allowed a relocation and one of the
factors considered was that the father, the custodial parent, was moving to Florida near the
maternal grandmother. Herein, Ms. S. moved away from the extended family members. It
may be stating the obvious that closeness to extended family is in the children's best interests.
The Court finds that the children have a good relationship with both parents and believes the
move will impact on the relationship with whomever the non-custodial parent will be. Clearly,
there can be no midweek visitation with a distance exceeding a two-plus hour drive between the
two residences. However, as this Court cannot force the return of a parent to Nassau County or
its surrounding area, lack of midweek visitation, while not insignificant, will be made up through
the parenting schedule. See Tropea, supra , Wisloh-Silverman v. Dono, 39 AD3d 555 (2d Dept. 2007). Due to
the Court's belief that the move will effect the non-custodial parent's relationship with the [*14]children regardless of whoever that is, this particular
Tropea factor did not persuade or dissuade the Court to rule in favor of either party.
One of the issues the Court was most concerned about throughout these proceedings was the
mother's paramour, Mr. T.. Mr. T. was openly hostile not only to Mr. S., but to Mr. S.'s
parentage. Mr. T. regularly referred to the subject children as his children. He created a hostile
relationship with Mr. S. and had no problem letting the children see this. On one occasion, in the
children's presence, he screamed at Mr. S., demanded Ms. S.'s child support money and was
physically aggressive. Mr. T. stated that Mr. S. was a bad parent and a bad person and had no
problem expressing this opinion to Mr. S. as well as others. The fact that Mr. T. very clearly
dislikes Mr. S. is not the problem. The problem is he would not hide this opinion from the
children. In a case of extreme brashness and parental entitlement, Mr. T. left a message on Mr.
S.'s answering machine for the girls telling them not to let their father give them drugs. Such a
statement was meant to undermine the father's relationship with his children and also may have
planted in the children's minds that their father was a drug user, something for which no evidence
whatsoever was presented. Mr. T.'s demeanor during this trial, the statements he has made, his
actions toward Mr. S. all indicate his desire to ensure the girls do not respect their father. Add to
this the three (3) CPS allegations made by Mr. T. against Mr. S., all of which were unfounded. It
is likely these actions were intended to harass Mr. S.. The Court is at a complete loss how a man
with two children of his own could be so disrespectful toward another father, and at a greater loss
as to how Ms. S. allowed this behavior and atmosphere to flourish.
Awarding Ms. S. custody would, in the Court's opinion, be placing the children in an
environment which is hostile to their father. The Court could try to issue directives describing
what behavior would be inappropriate in front of the children, but the mother has made it clear
she does not honor court orders. This entire case began because the mother ignored the clear and
specific terms of her divorce stipulation indicating she could not move outside of a fifty mile
radius without written consent of the father or a court order. She sought and received neither, yet
moved one hundred and forty miles away. The Court absolutely believes that the father was not
aware of the move prior to its occurrence and also believes that, after the move, the mother
dictated the terms of his visitation. This opinion is buttressed by the mother's complete disregard
of the procedures and dictates of this Court during the early part of these proceedings. Her refusal
to come to multiple court appearances indicates her failure to take the proceedings seriously. But
to appear in Court on the morning of December 21, 2006, be told to come back in the afternoon
and instead decide to leave before the afternoon session is indicative of a lack of respect for the
Court and unadulterated hubris. Her story that a lawyer told her she could leave, even though the
Court told her to come back, is simply impossible to believe. Further, her inability to explain
why, after she left, she was unable to be reached on her cell phone adds to the Court's belief that
this story is a total fabrication. Of course, the Court cannot know for sure why she chose to leave
and make herself unreachable, but the Court is certain it has to do with her and Mr. T. finding the
court proceedings nothing more than a nuisance right up until the moment the children were
removed from their custody. And even then, problems persisted with getting them fingerprinted,
their behavior toward attorneys involved in the case and still more missed court dates. All of
which leaves the Court with the impression that neither Ms. S. nor Mr. T. would find an order of
this Court something with which they needed to comply.
It is of paramount importance to this Court that these children have the benefit of a close
[*15]relationship with both parents. It is clear the father is much
more likely to foster an ongoing relationship between the children and their mother than Ms. S.
would with the father. Green v. Gordon, 7 AD2d 528 (2d Dept. 2004). To foster a
relationship with the other parents requires the custodial parent to put the children's needs first.
Lohmiller v. Lohmiller, 140 AD2d 497 (2d Dept. 1988). Mr. S. has demonstrated he is
willing to do so. In fact, Mr. S. was willing to forego his own rights to the extent that he was
willing to give up custody of the girls voluntarily if he was told that it would be in the children's
best interests. This is confirmed by Dr. Favaro's testimony and his assessment of Mr. S.. On the
other hand, the Court has not seen any such selflessness from the mother.
It is the Court's opinion after weighing all the Tropea factors, and other factors
except the wishes of the children, that the father should be awarded custody. It is undisputed that
the children wish to live with their mother. They love her and miss their siblings J. and S. The
children's wishes are one factor to be considered by the Court, but are not determinative.
Young v. Young, 212 AD2d 114 (2d Dept. 1995), Darema-Rogers v. Rogers, 199
AD2d 456 (2d Dept. 1993). In considering the children's wishes, the Court must take into
account the children's ages, level of maturity and the extent to which they may have been
pressured or influenced in regard to their choice. Eshbach v. Eshbach, 56 NY2d 167
(1982). "The desires of young children, capable of distortive manipulation by a bitter, or perhaps
even well-meaning, parent, do not always reflect the long-term best interest of the children".
Matter of Nehra v. Uhlar, 43 NY2d 242, 249 (1977).
At the time of the second in camera interview, the children were 13 and 10 years old.
They are extremely bright and express themselves easily. The Court found their level of maturity
to be beyond their years, and the testimony in the case supports this. They have strong opinions
and have no problem expressing them, even if it means criticizing their stepmother's parenting
skills, cooking or dress. However, it is clear to the Court that at some point they were pressured
by the mother and Mr. T.. This is clear from the testimony of the parties as well as Dr. Favaro.
The Court cannot say for certain whether Ms. S. put direct pressure on the girls to say and do
particular things, but it does seem clear that Ms. S. expressed to the children how upset she is
without them. The Court does believe Ms. S. has expressed to the children how hurt she is that
the children are now living with their father and how much she and Mr. T. miss them. The result
of this could likely be the children feeling responsible for, and guilty about, their mother's
unhappiness. At least this is what the Court believes happened. The children's expressed desire
for their home, school and friends in Pennsylvania, a place where they lived less than five
months, seemed couched in adult terms. The Court finds it strange that the same wishes, worded
the same way, were expressed by the children in near identical terms in both in camera
interviews, despite the fact they were done seven months apart.The same could be said for
their criticisms of their stepmother. In the end, the Court found it strange that the children were
so strongly attached to the home, school and friends in Pennsylvania when it was hours away,
and essentially isolated, from the friends and family they had been surrounded by for their entire
lives. For all these reasons the Court finds their stated desire to live with the mother was, at least
in part, the result of pressure put on them by the mother and Mr. T.
The Court is aware that, in general, when there is an agreement between the parties dictating
custody, that agreement is to be given preference. Eshbach v. Eshbach, supra . And
while it is to be given due consideration, such consideration should not be given priority after
weighing the best interests of the children. Eshbach v. Eshbach, supra . The Court also
notes that the children have [*16]been living with their father for
almost one full year at the writing of this decision. Since no action was ever taken to challenge
that change of physical custody at the time the prior Judge made that decision, this Court finds
the custody provision of the parties' divorce stipulation to be of even lesser importance.
Finally, the Court has also viewed the evidence in this case from the perspective of a
modification petition, which is what the father filed originally. "The hearing court may order a
change in custody if the totality of the circumstances warrants a modification in the best interests
of the child." Ganzenmuller v.
Rivera, 40 AD3d 756, 757 (2d Dept. 2007), citing Friederwitzer v.
Friederwitzer, 55 NY2d 89, 95, 447 NYS2d 893, 432 NE2d 765; Matter of Brian S. v.
Stephanie P., supra {34 AD3d 685} at 686, 825 NYS2d 232). In this case, the totality of the
circumstances includes the mother's unauthorized relocation, the mother's paramour undermining
the father's authority and role to the children, the father's stability, the father putting the children's
best interests before his own interests and the credibility of the father and his wife.
Accordingly, the Court finds that it would be in the children's best interests for their father to
have sole custody of them. The father shall consult with the mother on all major decisions
regarding health, education and general welfare. The parents should work together to reach
consensus on these decisions, however if they cannot, the father shall have final decision-making
power.
The mother shall have parenting time on alternate weekends on the same schedule they are
currently using. The same pick up and drop off arrangements shall continue, with the parties
meeting at Liberty Park. If the children are in a school district with three breaks during the year
(winter, spring, Christmas/New Years), then the mother will have the children on two of the three
breaks each year. The parties will alternate the Christmas break, so that when the father has the
Christmas break the mother will have the winter and spring break that year. On the year the
father does not have Christmas he will have the children for the Spring break. If the children are
in a district with two breaks, the parents shall alternate each break. The mother shall have the
children for the majority of the summer. The children will stay with the father from the end of
school until July first. The children will go to the mother from July first until July twenty first.
The children will stay with the father from July twenty-first until August first. The children will
then go to the mother on August first until one week before school starts.
The parties will alternate all other major holidays. The mother shall have Mother's Day each
year and the Father shall have Father's Day each year. To avoid the children being forced to
spend even more time in the car going back and forth, if Mother's Day falls on the father's
weekend, then that weekend will become the Mother's weekend and alternating will continue
from there. While this may result in the mother getting two weekends in a row, the same rule will
apply to Father's Day with the father getting that weekend even if it falls on the mother's
weekend. If the children's birthdays fall midweek, the mother may have dinner with them, from
6:00 p.m. to 8:00 p.m. on the birthday if she drives to the father's home to pick them up. If the
children's birthday falls on a weekend, then the regular weekend schedule will apply.
With the above custody and parenting (visitation) terms, the Court has tried to take into
consideration that the children will spend many hours in a car driving back and forth, and
attempted to limit that to the extent possible. Should the mother choose to move closer, or within
a fifty mile radius of the father's home, the Court would be open to reconsidering these
arrangements. This [*17]should not be read to mean that any such
move would automatically result in a "change in circumstances" per se, though it might at the
time it is considered.
Each parent shall allow the other parent liberal and unhampered phone contact with the
children. Neither parent shall speak negatively about the other to the children, nor shall they do
so in the children's presence. Each parent will ensure that no other person speaks negatively of
the other parent to the children. The Court will view a violation of this provision very seriously.
The father shall have physical possession of the children's passports if they exist. Should
either parent travel with the children outside the state of their residence, they must provide the
other parent with the address of where he or she will be staying and phone numbers to be used
only in the case of emergency. Each parent may travel internationally with the children, but the
other parent must be given a minimum of one month notice, in writing, of any such travel.
Should the mother need the children's passports and something in writing from the father
allowing her to so travel, he shall so provide.
There shall be any other parenting time as is agreed upon by the parties.
Therefore, based on the foregoing, it is
ORDERED that W.S. shall have sole legal and residential custody of the children
M.S. and L. S.; and it is further
ORDERED that the mother shall have parenting time (visitation) as described in
this decision.
This constitutes the Decision and Order of the court.
ENTER
________________________________
HON. CONRAD D. SINGER
Judge of the Family Court
Dated: December 17, 2007
Check applicable box:
Order mailed on [specify date(s) and to whom
mailed]:________________________________
Order received in court on [specify date(s) and to whom
given]:_________________________
PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT AN APPEAL
FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER
BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER
TO APPELLANT BY THE CLERK OF THE COURT, OR 30 DAYS AFTER SERVICE BY A
PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS
EARLIEST.