G.O. v S.O. (2025 NY Slip Op 50537(U))

[*1]

G.O. v S.O.

2025 NY Slip Op 50537(U)

Decided on April 10, 2025

Supreme Court, Richmond County

DiDomenico, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 10, 2025
Supreme Court, Richmond County

G.O., Plaintiff

against
S.O., Defendant

Index No. 50220/2018

Plaintiff Father is represented by:
Adelola Sheralynn Dow Esq.
Adelola Sheralynn Fields Obalanege, PLLC
900 South Ave Ste 46, Staten Island NY 10314 
Defendant Mother is represented by
Alison Aplin Esq.
281 Rhine Avenue, Staten Island, NY 10304 
Attorney for Subject Child D is
Scott Schwartz Esq. 
36 Richmond Ter. Ste. 103, Staten Island NY 10301 
Attorney for Non-Subject Child M is 
Ian Craig Berliner 
42 Richmond Ter. Ste. 300, Staten Island NY 10301

Catherine M. DiDomenico, J.

Recitation as required by CPLR 2219(a) of the papers considered in the review of Motion
Sequence Number 001.
Numbered
Order to Show Cause by Plaintiff (001), 1
Affirmation in Opposition to 001 by Defendant 2
Pre-Hearing Documents (both parties) 3
Hearing Transcripts 4
Written Summations (all parties) 5
Documentary Evidence Offered at Hearing 6
Upon the foregoing cited papers, the Decision and Order is as follows:
Procedural History
By Order to Show Cause dated July 16, 2021 (mot. seq. no. 001), Plaintiff G. O. ("Father") moved for a change in custody of the parties' two minor children (D. DOB X/XX/09; and M. DOB X/XX/11), alleging a significant change in circumstances since entry of the parties' Judgment of Divorce (dated August 1, 2018). Father claims that it would be in the best interests of the children for him to have an order of sole custody. In the alternative, Father sought expanded visitation, and an order directing that Mother bear the responsibility to transport the children to and from his Staten Island home for his parenting time. At all times relevant to his motion, Father was represented by Sheralynn Dow Esq. Mother was represented by Alison Aplin Esq. By Order dated October 27, 2021, this Court appointed Scott Schwartz Esq. to serve as an attorney for both children. Mr. Schwartz has "substituted judgment" for the subject child D. as she presents with developmental disabilities that prevent her from formulating a position regarding her custodial preferences. See Matter of Elliot Z. (Joseph Z.), 165 AD3d 682 (2d Dept. 2018).
A Stipulation of Settlement ("Stipulation") that served as a basis for their Judgment of Divorce was signed by the parties on or about March 29, 2018. The Stipulation was entered into after collaborative mediation and submitted to the court as the basis for an uncontested divorce. The Stipulation was incorporated into a Judgment of Divorce but did not merge. At the time the Stipulation was entered and signed, Father was represented by an attorney while Mother was self-represented. The Stipulation provided for physical custody of D. and M. to be with Defendant S. O. ("Mother"), and for the parties to share joint legal custody. Parenting time was granted to Father pursuant to a schedule set forth in the Stipulation. This schedule provided Father with a weekday visit from after school until 8:00 PM and alternate weekend overnight visits from Friday at 6:00 PM until Sunday at 6:00 PM with Father responsible for all pickup and drop-off. Father was also given two weeks of summer vacation and a schedule of holiday visitation. The Stipulation also included a relocation clause that prohibited Mother from moving with the children beyond a 40-mile radius from the former marital home in Staten Island without written consent of Father.
Following entry of the Judgment of Divorce in the Summer of 2018, Father moved from Staten Island to Brooklyn and started dating his current wife, Stepmother. Father and Stepmother were married on August 21, 2020. Father and Mother often modified their stipulated parenting schedule to accommodate Father's work schedule as a police officer. In or around May 2018, Mother moved from Staten Island to Red Bank New Jersey. Mother's desire to relocate was anticipated in the Stipulation provided that such move was within 40 miles from her Staten Island address. Father and Stepmother enjoyed a good relationship with M. and D. until 2022 when an incident occurred (the "January 2022 Incident") involving M., Father, and Stepmother regarding M.'s text messages to Mother. M. has not returned to visit with Father since that incident. Mother has not remarried but lives with her fiancé J.D. Mother and J.D. have a daughter named T., the subject children's half-sister, who presents with cerebral palsy and other special needs. Mother, Mr. D., D., M., and T. reside together in Mother's home. Father lives with his wife, Stepmother. They have no children, and none are anticipated.
In support of his motion, Father alleges that an "extreme and significant change of [*2]circumstances" occurred since the Judgment of Divorce was signed in 2018. Specifically, Father alleges, inter alia, that Mother neglected D.' s medical and hygienic needs and engaged in acts that amount to the parental alienation of M. from him. He also claims that the parties' co-parenting relationship has deteriorated to the point where joint custody is no longer practical. Mother has filed written opposition to Father's motion wherein she vehemently disputes his factual allegations. She argues that Father failed to allege a sufficient change in circumstances to permit this court to conduct a best interests hearing. 
During the pendency of this action, Father made the difficult decision to withdraw his request for a change of custody for M. and to continue this proceeding only as to D. Father indicated that M.'s steadfast refusal to visit or speak with him since January 2022 convinced him to withdraw his claim. Father believed that pressing his application for custody of M. would unnecessarily cause her stress with little likelihood of success after her wishes were considered by this Court. When M. (13 years old) insisted to be heard in the proceedings, now as a witness, this Court appointed Ian Berliner Esq. to represent her interests by Order dated October 4, 2023. Mr. Schwartz remained as D.'s attorney.
At various times during this proceeding, Mother and AFC Schwartz argued that Father failed to make a sufficient showing of a change in circumstances sufficient to warrant a "best interests" hearing, and that Father's motion should be summarily denied for this reason. After hearing oral argument, this Court issued an Order dated July 24, 2024, finding that Father made a prima facie showing of a change in circumstances sufficient to trigger a best interests hearing. While Father's allegations against Mother were disputed, M.'s change in behavior towards him was undisputed. Prior to this litigation, M. visited with her father on a consistent basis. However, over time, their relationship deteriorated to the point where they no longer have any meaningful contact. Father also alleged that M. began referring to him as "G." rather than "Dad" and began using that title to refer to Mother's fiancé, J.D. Father argued that M.'s refusal to visit and the change in her behavior exhibited the indicia of parental alienation sufficient to establish a change in circumstances and to warrant a best interests hearing. This Court agreed with Father and found that M.'s refusal to communicate with Father, together with her change in opinion towards him, were sufficient grounds to proceed to a best interests hearing.[FN1]
See e.g. Matter of Morales v. Diaz, 2024 NY Slip Op 06610 (2d Dept. 2024); see also E.V. v. R.V., 165 AD3d 736 (2d Dept. 2018);Matter of E.S. v. S.S., 114 N.Y.S.3d 190 (Fam. Ct. Brx. Cty. 2019). It is important to note that Father does not claim parental alienation as to the remaining subject child D. Rather, the claim is asserted only with respect to M. Thus, this case raises the question of whether and when the alleged alienation of a non-subject child can be used as evidence of parental alienation of a subject child sufficient to support a custodial change.
The Hearing
A lengthy best interests hearing was held over the course of thirteen days.[FN2]
Father introduced forty-eight documents into evidence. He testified on his own behalf and called the following additional witnesses: Stepmother, the neutral forensic evaluator Dr. Stephen Herman, and Defendant Mother S.O. Over Mother's objection, Father also called the non-subject child M.[FN3]
Defendant Mother called no witnesses but engaged in lengthy cross examination of Father's witnesses. Mother introduced thirteen documents into evidence. All parties agreed that due to D.'s pervasive special needs, an in-camera examination would not be productive and therefore was waived. For the reasons set forth below, this Court finds that Father failed to prove it is in D.'s best interests to modify the parties' Stipulation and award him sole legal custody. Father's alternative application for increased parenting time with D. and shared transport is granted to the limited extent set forth below.
Father's Allegations
During the hearing, Father attempted to establish that he is the better custodial parent for D. In support of his position, Father testified that he believes he can better care for D.'s special needs. He alleged that Mother has neglected D.'s educational, physical, and emotional needs, particularly after the birth of T. Father expressed concern that D. was being physically abused in Mother's home as evidenced by "grab bruises." Father further alleged that after he confronted Mother about his concerns, the parties' relationship deteriorated. He also claimed that Mother's relocation to New Jersey negatively impacted his weekday visitation rights. Finally, Father alleged that Mother has alienated M. from him. He fears this alleged alienation may have a collateral effect on his relationship with D., which is presently thriving. Father has not, at any point, alleged that D. has ever been alienated from him or that he has seen any potential signs of alienation. All the witnesses who testified at the hearing agree that Father and D. have a close loving relationship.
Mother's Allegations
Mother claimed that Father failed to establish that he is the better custodial parent for D. She further claimed he has abused the judicial process by making at least two baseless calls to child protective services on her and by misusing his position as a police officer to access private information to harass her current partner and gather "evidence" against them. She also alleged that Father abused her willingness to modify the visitation schedule by emailing her threats that he would retain the children if she did not agree to pick them up at the time and place of his choosing in violation of their Stipulation. Mother argued that Father's application is motivated by [*3]his desire, and that of his new wife, to reduce his child support obligation and to destroy her family financially and emotionally. Mother further argued, that if this Court were to grant Father's application, it would cause the separation of D. from her two sisters, an unconscionable result opposed by Mr. Schwartz and contrary to the recommendations of the forensic evaluator, Dr. Stephen Herman M.D.
In her summation, Mother seeks an order of sole custody of both children, a reapportionment of expert fees, and an award of counsel fees. However, these applications were not plead in a motion or cross motion, nor were they properly briefed and litigated before the Court. Generally, an application for affirmative relief must be raised by way of cross motion. See CPLR §2215; see also Lee v. Colley Group McMontebello, LLC, 90 AD3d 1000 (2d Dept. 2011); Flores v. Flores, 22 AD3d 372 (1st Dept. 2005); Smith v. Charles, 964 N.Y.S.2d 63 (Sup. Ct. Kings Cty. 2012). While in certain circumstances, a Court has discretion to award relief requested in a procedurally improper manner, it must do so sparingly, and only when the issues are interrelated to the relief sought in the motion papers, and fully briefed and litigated despite the procedural deficiency. See e.g. Fried v. Jacob Holding Inc., 110 AD3d 56 (2d Dept. 2013); see also Trevino v. Pray, 217 AD3d 592 (1st Dept. 2023). Here, Mother's requests for affirmative relief cannot be considered by this Court. Mother's failure to file a motion, despite being given several opportunities to do so, precludes her claims for affirmative relief. See Hergerton v. Hergerton, 235 AD2d 395 (2d Dept. 1997); see also New York State Div. of Human Rights v. Oceanside Cove II Apt. Corp., 39 AD3d 608 (2d Dept. 2007); Crocker C. v. Anne R., 41 N.Y.S.3d 718 (Supt. Ct. Kings. Cty. 2016). Mother was encouraged many times during this proceeding to bring whatever affirmative motion she deemed appropriate, but she failed to do so. Under these circumstances, it would be prejudicial to Father to grant affirmative relief pled for the first time in Mother's summation. 
Applicable Law
A court may modify an order or judgment awarding custody and parental access upon a showing that: (1) there has been a subsequent change in circumstances and (2) that the requested modification is in the best interests of the child. See Matter of Morales v Diaz, 233 AD3d 1033 (2d Dept 2024); see also Matter of Narine v Singh, 229 AD3d 700 (2d Dept 2024). Hearings are not automatically required whenever a party seeks a change in custody or parental access. See Matter of Acworth v. Kollmar, 119 AD3d 676 (2d Dept. 2014). "Before a full hearing is ordered, the parent seeking a change in custody must make an initial evidentiary showing of a change in circumstances demonstrating a need to conduct a full hearing into whether a change of custody is appropriate in order to ensure the child's best interests." Matter of Newton v. McFarlane, 174 AD3d 67 (2d Dept. 2019). After hearing argument, this Court previously ruled that a substantial change of circumstances has been established by Father (See SFO dated 10/4/23). Accordingly, this Court proceeded to consider what custodial and access arrangement would be in D.'s best interests.
When making a custodial determination, the paramount concern is the best interests of the child under the totality of the circumstances. See Matter of Luke v Erskine, 222 AD3d 868 (2d Dept 2023). When deciding whether a modification is in a child's best interests, the "[f]actors to be considered include the quality of the home environment and the parental guidance the custodial parent provides for the child, the ability of each parent to provide for the [*4]child's emotional and intellectual development, the financial status and ability of each parent to provide for the child, the relative fitness of the respective parents, and the effect an award of custody to one parent might have on the child's relationship with the other parent" See Matter of Walker v Sterkowicz-Walker, 203 AD3d 1165 (2d Dept 2022); see also Matter of Kreischer v Perry, 83 AD3d 841 (2d Dept 2011). The weight afforded to each factor lies within the discretion of the hearing court given the circumstances of a particular case, and requires an evaluation of the testimony, character, and sincerity of all the parties and witnesses involved. See Bourne v Bristow, 66 AD3d 621 (2d Dept 2009).
Factors Considered
Over the course of a lengthy hearing, both parties made numerous allegations against each other regarding their respective fitness to parent D., and to a more limited degree, M. Only the evidence deemed to be most relevant to the issues of custody and parental access is addressed herein. However, all arguments raised by the parties were considered by this Court in determining the best interests of D. See Matter of Mendoza v. Riera, 232 AD3d 616 (2d Dept. 2024).
(1) Status Quo / Primary Caretaker
Pursuant to their Stipulation, the parties agreed to share joint legal custody of D. and M. with primary physical custody being granted to Mother. Mother testified that they agreed to this arrangement because she was the children's primary caretaker while Father worked full time as a police officer. The arrangement set forth in the Stipulation has been the status quo since the Judgment of Divorce was entered in August 2018. "Maintenance of [the] status quo, while not decisive, is a positive value entitled to great weight" in a custody termination. See Matter of Newton v. McFarlane, 174 AD3d 67 (2d Dept. 2019). An Order continuing the status quo custodial arrangement affords both "stability" and "continuity" for the subject child. See Lieberman v. Lieberman, 142 AD3d 1144 (2d Dept. 2016). Stability and continuity are especially important for a child presenting with special needs. See Audreanna W. v. Nancy WW., 158 AD3d 1007 (3rd Dept. 2018); see also B.K. v. J.N., 26 N.Y.S.3d 212 (Sup. Ct. Rich. Cty. 2015).
Mother credibly testified that D. is active, happy, and well cared for in her home under the current custodial arrangement. D. has made considerable progress in dealing with her special needs. She has made friends in New Jersey and has also been accepted by M.'s friends. In addition, D. is active, primarily through the efforts of Mother, in an array of extracurricular activities located in that state. Most of the services Mother fought hard to obtain for D. are provided in her home, at school, or in the nearby community. For example, D. currently receives occupational therapy, physical therapy and speech services together with in house therapy to teach her daily living skills. Many of these benefits are provided by the State of New Jersey through accredited providers and programs. A change in physical custody to New York would likely disrupt these services causing delay and a change in service providers, all to D.'s detriment. See Moorehead v. Moorehead, 197 AD2d 517 (2d Dept. 1994). Father has taken D. for additional speech therapy and art therapy in New York during his parenting time. However, these are the only limited services provided in New York.
Father alleged that Mother's relocation to New Jersey in May 2018 frustrated his ability [*5]to utilize his weekday parenting time. While this Court acknowledges Father's annoyance about traveling to New Jersey, there is no evidence that Mother violated the agreed upon 40-mile radius clause in their Judgement of Divorce. Rather, it appears that Mother moved somewhere around 35 miles from her former Staten Island residence. When the Stipulation was signed, both parties lived in Staten Island. After Father met Stepmother, he moved to Brooklyn in 2018. This move increased his commute to New Jersey to pick up his children. He then moved back to Staten Island in 2020. Mother credibly testified that she informed Father of her intention to move to New Jersey and he did not object other than to request that he remain informed of her plans. Notably, while the parties' agreement makes Father solely responsible to transport the children to and from visitation, Mother has voluntarily shared transportation duties with Father until 2021 when their co-parenting relationship deteriorated, and the present motion was filed.
This Court finds that switching residential custody of D. to Father would cause colossal upheaval in her life, removing her from her friends, her sisters, her programs and services, her school, and her extracurricular activities. While this Court believes Father would undertake his best efforts to arrange alternative services and activities, the disruption to D.'s life would be substantial, if not traumatic. The effect that a change in custody would have on D.'s established life, including her services, education, friends, and activities has been given considerable weight in this Court's custodial determination. See Matter of Newton v. McFarlane, 174 AD3d 67 (2d Dept. 2019). Notably, in situations where both parents present as suitable custodial options, the Court is authorized to afford additional weight to the stability provided by maintaining the status quo. See Lawrence C. v. Anthea P., 79 AD3d 577 (1st Dept. 2010); see also Lumbert v. Lumbert, 229 AD2d 683 (3rd Dept. 1996). Courts have acknowledged that where is it established that neither parent is unfit, the interests of the subject child are often best served by simply preserving the status quo. See Matter of Peroglu v. Baez, 54 AD3d 416 (2d Dept. 2008). 
(2) General Fitness to Parent / Caring for D.'s Special Needs
The relative fitness of each parent, and the quality of their respective home environments is another factor entitled to considerable weight in any custodial determination. See Matter of Torres v. Cortes, 168 N.Y.S.3d 884 (2d Dept. 2022). Throughout the hearing, Father attempted to establish that Mother failed to meet D.'s basic needs by neglecting her medical and basic hygiene needs. Specifically, Father and Stepmother testified that they began observing issues with D.'s care in or around November 2019 when she presented with severely chapped lips. Father alleged that this condition, and other issues with her hygiene, continued until around November 2022 when D. matured and was able to care for herself more independently. Close analysis of this timeline reveals that Father's allegations relate to a specific three-year period between 2019 and 2022. Father and Stepmother testified that during these years D. frequently exhibited cracked and chapped lips, which required medical care on at least two occasions, and poor personal hygiene such as "smelling like an onion." They further testified that D. came to visit in poorly fitting clothing and with messy greasy hair. Father's concerns reached a pinnacle in October 2020 when D. presented for a dinner visit with feces in her underwear ("The Texas [*6]Roadhouse Incident").[FN4]

While Father's concerns about D.'s welfare appear genuine, he failed to prove that Mother's actions or omissions caused these conditions. Father did not call a medical expert, such as the subject child's pediatrician, or any other expert witness to substantiate his claims of abuse or medical neglect. He also failed to offer any medical records that would support his claims. Rather, he relied upon his own observations together with those of his wife and speculated that D.'s issues must have resulted from a lack of attention and care on Mother's part. The only expert witness who testified during the best interests hearing was the court appointed forensic doctor, Stephen Herman M.D. Dr. Herman's report indicates that he did not personally observe any of the conditions complained of by Father. While he did not opine much further on the subject, Dr. Herman certainly did not attribute D.'s alleged poor hygiene to a lack of care on Mother's part. On balance, this Court credits Mother's position that the issues identified by Father, to the extent substantiated by photographs, were likely a natural result of D.'s pervasive special needs and cannot be attributed to the "fault" of one parent or the other.
For example, when the "Texas Roadhouse Incident" occurred in October 2020, Father assumed that it must be "Mother's fault." However, the record does not support this indictment. The record is unclear as to when, or why, the child soiled herself. Mother credibly testified that she picked D. up after school and drove her and M. directly to the Cheesequake rest area on the Garden State Parkway to meet Father for a visit. She credibly testified that she was not aware that D. had soiled herself assuming it even happened in her car as opposed to his car. Father and Stepmother then transported D. and M. directly to a Texas Roadhouse restaurant located in a busy commercial area of New Jersey. After D. arrived at the restaurant, she asked to use the bathroom. Stepmother took D. to the bathroom, photographed the soiled underwear, then cleaned her up "the best she could." Rather than going to one of the many nearby stores to buy this child new underwear, or simply throwing out the soiled underwear, they allowed D. to sit in this condition for the remainer of the dinner visit. When cross examined by D.'s attorney as to why they didn't buy her new underwear, Stepmother testified "we could have, you're right, we could have, we didn't." (Tr. 10/12/23 p. 25). This failure resulted in D. having to sit in soiled underwear for at least an hour and a half while the family finished dinner. In addition, Stepmother showed Father the photograph of the D.'s underwear and discussed the same in front of the children stating, "she shouldn't be in that condition she needs to be clean" (Tr. 10/4/23 p. 121). This discussion clearly did not need to occur in front of D. and her sister.
At the end of the visit, D. and M. were returned to Mother. There was an ugly confrontation between the parties initiated by Father. He accused Mother of not properly caring for D.'s hygiene. Mother claimed that she didn't know D. had an accident. Father has identified this incident, among others, as one of the primary reasons he decided to seek a change in custody. While the fact that D. soiled herself was unfortunate, there is no evidence as to when, or why, it happened. Mother did not detect the situation while she transported D. to Father, but neither did Father or Stepmother as they transported her to dinner. M. also did know D. had an [*7]accident although she was seated next to D. in Father's vehicle. It was only when D. asked for help that the situation was discovered. This Court finds that Father failed to prove that it was Mother's actions or inaction that caused this incident. To the contrary, this Court credits Mother's testimony that she was unaware of the situation until Father confronted her. More concerning to this Court is Father and Stepmother's poor choice to leave D. in soiled underwear for approximately an hour and a half after the issue was discovered. As Stepmother admitted, it would have been easy for Father to leave the restaurant and purchase new underwear for his daughter, but instead he chose to leave her in this condition. Neither Father nor Stepmother offered a viable explanation as to why they made this poor parenting choice while simultaneously claiming that Mother is less capable to care for D.'s hygienic needs.
Father also alleged that Mother failed to meet D.'s basic medical needs and used incidents involving her skin and lips as examples. Father introduced photographs illustrating several conditions, such as acne and chapped lips. However, Father did not call any medical expert to support his claim that Mother was either responsible for these conditions or failed to adequately treat them. Due to her special needs, D. is under the consistent care of doctors, therapists and other professionals. None of these experts testified on Father's behalf. For example, regarding acne, it is undisputed that D. was under the care of a dermatologist. In fact, a dermatological treatment recommended to address D.'s skin condition was delayed when Father demanded that Mother find a plan approved doctor to reduce the out-of-pocket medical costs. While the Court understands the benefit of using a participating provider, it delayed treatment. There is no evidence that Mother failed to treat D.'s skin conditions.
Finally, with respect to D.'s allegedly infected lip, Mother explained to Father in detail what had occurred. D. went to the dentist for treatment and a numbing agent was used. She accidently bit her lip and was given a small dose of antibiotics. Father knew this information prior to his weekend visit. On Sunday, D. woke up with a split lip and blood on her pillow. Without Mother's knowledge, Father authorized Stepmother to bring D. to urgent care. She was conservatively treated and returned to Father's house to continue the visit. Father did not inform Mother that Stepmother took D. to urgent care. Instead, he contacted child protective services ("CPS"). CPS investigated and interviewed both children at Mother's home in New Jersey. No action was taken against Mother, but the interviews upset the children and Mother.
A second call to CPS was made against Mother by an "art therapist" Father retained for D. over Mother's objection. Father did not call this therapist as a witness. Therefore, this Court does not know why this report was called in against Mother. Father claims that the therapist was concerned about alleged "writings" that D. had made during her sessions. However, it is undisputed that the investigation (like the prior one) did not result in any action on the part of CPS. These "writings" were not introduced into evidence at the hearing.
This Court credits Mother's testimony that she cares for all three of her children, two of whom have significant special needs, in a loving, consistent way. Regarding D., Mother credibly testified that she has spent considerable time educating herself about D.'s disabilities and has become an advocate and advisor for other parents with special needs children. In addition to self-education, she has attended conferences and trainings on the subject. Father and Stepmother, on the other hand, have admitted that although D. is now almost sixteen years old, they have not yet attended any trainings or classes regarding her special needs. They testified that they are open to doing so at some point in the future.
All parties acknowledge that D.'s special needs make it difficult for her to meet people [*8]and make friends, which has resulted in stunted social skills. Mother has attempted to address this issue by engaging D. in various sports and activities. Mother credibly testified that she has enrolled D. in a New Jersey based program "RallyCap Sports," which is geared towards incorporating children with special needs in sports and activities with neurotypical children. Mother has also enrolled D. in a basketball program where she attends events with a high-school team, wears the team jersey, and participates in warm-ups. When questioned about his level of involvement and participation in these events, Father testified that D. does not attend scheduled practices or games during his parenting time. Moreover, Father does not seek to attend any of her games or events during Mother's parenting time. On balance, this Court finds that Mother has established that she is more capable of ensuring that D. is well socialized and exposed to a diverse group of people. See Bourne v. Bristow, 66 AD3d 621 (2d Dept. 2009).
After considering the relevant evidence, this Court finds that Father has failed to establish that Mother is an unfit (or less fit) parent. Rather, both parents are capable of meeting D.'s care requirements. Accordingly, this factor does not strongly weigh in favor of either parent. However, on balance, Mother has taken a much more active role in educating herself on the issues presented when caring for a special needs child and for advocating for programs and services on D.'s behalf. Moreover, some of Father's choices when dealing with D. are concerning. As alleged by Mother, Father and Stepmother appear to, at times, be more interested in obtaining "evidence" to use against Mother than they are in addressing D.'s issues. Accordingly, to the extent that this factor weighs in favor of either parent, it weighs towards Mother as her education on the topic of special needs places her in a better position to provide for D.'s emotional and intellectual development. See Matter of Gadsden v. Gadsden, 144 AD3d 1035 (2d Dept. 2016).
(3) Separation of Siblings
As indicated above, the Court must consider the value in maintaining the custodial status quo as to not unnecessarily disrupt the lives of children. See Matter of Peroglu v. Baez, 54 AD3d 416 (2d Dept. 2008). An essential component of this consideration is the presumption under New York law that siblings should generally remain together. See Eschbach v. Eschbach, 56 NY2d 167 (1982); see also Matter of Kadi W. v. ACS-Kings, 167 AD3d 757 (2d Dept. 2018). "Young brothers and sisters need each other's strengths and association in their everyday and often common experiences, and to separate them, unnecessarily, is likely to be traumatic and harmful." Obey v. Degling, 37 NY2d 768 (1975). While the law expresses a clear preference for keeping siblings together, the rule is not absolute and may be overcome where the best interests of each child lie in residing apart. See Matter of Audrey B. v. Shamica C., 226 AD3d 767 (2d Dept. 2024). 
Currently, D. resides with her sister, M., and her younger half-sister, T. While M. is two years younger than D., she fulfills many of the roles that an older sister typically would and assists in her care. Mother testified that M. and D. "are extremely close, very bonded, [and] excited to participate in things together" (Tr. 5/15/2024, p. 40). For example, when M. attends her friends' pool parties, D. goes with her. M. is also part of the same cheerleading team as D. This close bond is of increased importance in this case, as D.'s special needs make it difficult for her to establish independent social connections and relationships. As such, the acceptance of M.'s friends allows D. to maintain social connections with children that she might not otherwise [*9]be able to enjoy. 
Mother credibly testified that she believes the effect on D. of being separated from M. would be averse to her children. When asked why she felt separation would be harmful, Mother explained that D. and M. are "extremely bonded sisters and D. really looks to M. for help, guidance and friendship. They have a beautiful companionship" (Tr. 5/15/2024, p. 41). This sentiment was confirmed by Stepmother who testified that M. is "happy," "mature" and a "great sister" (Tr. 10/5/23, p. 214). Their close bond was emphasized by M. She credibly testified that she believed her father was trying to take her sister away and begged this Court to not permit it to happen.
Father has not addressed the issue of sibling separation other than to conclude that this case should fall within the exceptions to the presumption that siblings should remain together. Notably, when Father filed the present motion, he was seeking custody of both children. However, during the pendency of this action his relationship with M. soured, and she ultimately refused to visit. While the circumstances surrounding this estrangement is discussed at length below, Father's response was to discontinue his claims regarding M., creating the "spilt-custody" decision the Court now addresses. By withdrawing his claims as to M., Father removed this Court's ability to facilitate a reconciliation, either through therapeutic visitation, reunification therapy, family therapy, or other means. While Father credibility testified that he wanted to avoid causing further emotional harm to M., he fails to appreciate that M. would be devastated if she were separated from D. Father does not offer any suggestions as to how D. or M. should deal with the trauma of being separated other than to say that he would facilitate visitation.
Mother testified that she believes that removing D. from her half-sister T. would also be detrimental. Defendant testified that D. and T. share a very close bond. "D. is aware that T. has special needs and needs help, which D. sometimes recognizes and cues in on and help[s] her, which really shows D.'s growth with her own disability (Tr. 5/15/2024, p. 42). Father does not address the relationship between T. and D., other than to suggest that Mother is overburdened by having to take care of two special needs children. While this Court shares Dr. Herman's concerns that having two special needs siblings may have caused M. to shoulder more burdens than an average teenager, this is not a basis to change custody. While the presence of a half-sibling is not dispositive, it is another factor to be considered in making a custody determination. See Matter of Walker v. Cameron, 88 AD3d 1307 (4th Dept. 2011); Matter of Austin v. Smith, 144 AD3d 1467 (3rd Dept. 2016). It is generally preferrable for children to reside with their half-siblings if possible. See Matter of Ceballos v. Leon, 134 AD3d 931 (2d Dept. 2015).
It is not preferable to separate siblings unless there is a proper showing as to why it would be in their best interests to live apart from each other. See Mohen v Mohen, 53 AD3d 471 (2d Dept 2008). Here, Father has not made any such showing. A change in custody would result in the separation of D. from her sister and her half-sister causing devastating effects on these children. As such, this factor weighs in Mother's favor and has been given significant weight by this Court.
(4) Access to Extended Family
While not determinative, a child's access to extended family is a factor that would generally benefit the parent who fosters and provides that access. See Matter of Blakeney v. Blakeney, 99 AD3d 898 (2d Dept. 2012). Here, both parents reside with significant others. Mother is engaged to J.D., who she refers to as her husband, and is T.'s father. Father is [*10]remarried to Stepmother. Stepmother fulfills the role of stepmother to D., assisting her when she is in Father's care. She also serves as D.'s primary caretaker when Father is working. While both parties have raised concerns about the other's partner, the record supports a finding that D. maintains a good relationship with both Stepmother and J.D.
Stepmother and J.D. were evaluated by Dr. Herman. Dr. Herman described Stepmother as "caring and loving and dedicated and absent from mental illness" (Tr. 10/26/2023, p.40). When asked to describe his observations and professional opinion of J.D., Dr. Herman testified that "J.D. was an angry, frightened man, and by his own admission, probably committed a crime" (Tr. 10/26/2023, p.40). Dr. Herman did not suggest that either J.D. or Stepmother posed a danger to D.
The hearing record reveals that in 2018, J.D. was arrested and charged with a misdemeanor for providing an alcoholic beverage to someone under the legal drinking age. Specifically, it was alleged that J.D. supplied an alcoholic beverage to an eighteen-year-old girl who was babysitting M. and D. Mother testified that she learned of this incident shortly after it happened. Father only learned about the incident when he utilized his access as a police officer to investigate J.D. He called the arresting officer and got information concerning J.D.'s case. Mother testified that she was upset about the situation when it happened, but that she and J.D. addressed the issue in joint therapy and came to an understanding. While few specifics were offered, Mother believes J.D. plead guilty to an unidentified charge and received a sentence of community service. Mother indicated that she is not concerned about J.D. repeating his actions in the future. On the other hand, Father indicated that he is very concerned about J.D. being in the presence of his children. Neither party called J.D. as a witness at this hearing.
There was also extensive hearing testimony throughout the hearing about a campaign of disparagement waged between Mother and Stepmother on social media. Although each witness tried to blame the other, this Court finds that both were engaged in mutual attacks on various social media platforms. In addition, Mother used her social media accounts to publicly air her grievances against Father, such as calling him a "deadbeat." Sadly, M. had access to these accounts and saw many of the posts. There are no posts originating from Father. However, this Court does not credit his testimony that he was unaware of his wife's social media posts disparaging Mother. While such conduct shows a lack of maturity on the part of Stepmother and Mother, it was not shown that D. had access to social media or was otherwise aware of the disparagement. Moreover, given D.'s developmental challenges, it does not seem likely that she would understand the online posts, even if she saw them. What is clear is that neither Stepmother nor Mother seemed to care about the damage their social media war could have on the family. Accordingly, to avoid future issues, both parties are hereby enjoined from posting negative or disparaging comments about each other or Father on social media platforms whether direct or thinly veiled. Mother and Stepmother were not credible when they denied the posts were about the other. In addition, Father is directed to take steps to ensure that his wife refrains from disparaging Mother online. See e.g. Adams. v. Tersillo, 245 AD2d 446 (1997); see also Darby v. Dykes, 2023 NY Misc. LEXIS 55145 (Sup Ct. Kings. Cty. 2023). This restriction is narrowly tailored to disparaging online posts as they have already been seen by M. and will likely be viewed by her in the future should they continue to be posted. See Matter of Walsh v. Russell, 214 AD3d 890 (2d Dept. 2023).
This Court also heard disturbing testimony regarding Father's ongoing relationship with estranged members of Mother's extended family. Mother credibly testified that she has been [*11]estranged from one of her sisters, as well as her father, for many years. Notwithstanding this fact, Father fostered a relationship with his ex-sister-in-law "C." and his former father-in-law "S." Father frequently brought D. and M. to visit with Mother's estranged family although he knew Mother was adamantly opposed to continuing those relationships. M. credibly testified that she felt uncomfortable visiting her maternal relatives knowing that they do not get along with her mother. Mother credibly testified that her estranged sister posted a picture on social media of M. and D. celebrating Christmas at her house. This caused another social media battle that would have been avoided if Father simply respected Mother's wishes regarding the children visiting her family. Father claimed that he was actually visiting C.' s husband, J., who was his friend since high school. However, he could have visited his friend without bringing the children. Bringing D. and M. around their mother's estranged family was a poor choice that indicates an inability to effectively co-parent, a lack of respect for Mother's wishes, and a lack of awareness as to the impact of his behavior on M.'s emotional wellbeing.
(5) Ability to Foster a Relationship with the Non-Custodial Parent and Parental Alienation Claims
One of the most significant factors to be considered when making a custody determination is a custodial parent's duty to foster a relationship between the subject children and the non-custodial parent. See Matter of Copeland v Brown, 189 AD3d 1396 (2d Dept 2020). The inverse of this obligation, referred to as "parental alienation" typically occurs where the custodial parent not only fails to foster, but also takes steps to estrange the subject children from the non-custodial parent. See e.g. Matter of Morgan v. Morgan, 213 AD3d 669 (2d Dept. 2023). Alienation has been found when a "custodial parent unjustifiably frustrates the non-custodial parent's right of reasonable access" Matter of Addimando v Huerta, 147 AD3d 750 (2d Dept 2017). Parental alienation has been described by the appellate courts of this state as an "act so inconsistent with the best interests of the child as to, per se, raise a strong probability that the offending party is unfit to act as a custodial parent." Matter of O'Mahoney v O'Mahoney, 206 AD3d 819 (2d Dept 2022); see also Matter of Smith v Francis, 206 AD3d 914 (2d Dept 2022).
Father claims that parental alienation is a primary motivation for him seeking a change in custody. However, at no point has Father offered any proof whatsoever that D. has been alienated from him. In fact, it is not even alleged that D. has been alienated from him, or that he has observed any indica of potential alienation. To the contrary, Father, Stepmother and Mother credibly testified that D. has always shared a close loving bond with her father that remains strong to date. Rather than raising any direct claims of alienation regarding D., Father's claim of alienation stems from a strongly held belief that Mother has alienated M. from him. Father argues that, if left unchecked, Mother may alienate D. from him in the future as she has allegedly done with M.[FN5]

While M. is not the subject of the present motion, a considerable amount of hearing time was dedicated to the demise of her relationship with Father. Father claims that despite previously having a good relationship, M. stopped visiting him in January 2022. Mother credibly testified [*12]that M. started showing signs of visitation anxiety as early as 2019, and that the January 2022 incident detailed below was the "straw that broke the camel's back." Mother believes that M.'s anxiety was attributable to Father and his wife photographing D. during "virtually every visit" for "evidence" which made M. very uncomfortable (Tr. 3/11/2024, p. 76). This resulted in at least fifty photographs taken of D. Some photographs depict D. while she was undressed. Ten of these fifty photographs were admitted into evidence at trial.
Mother argues that M.'s estrangement is not the product of a single incident but resulted from a series of incidents. For example, Mother credibly testified that immediately following the Texas Roadhouse incident, M. got into her car and began to cry. According to Mother, "[M.] said she felt uncomfortable knowing that Stepmother was taking pictures of D. in the bathroom. She said that the whole thing is making her uncomfortable, it was giving her anxiety, [M.] doesn't like the feeling that they're under watch and the taking pictures. And [M.] knew that [Father] said he was going to take D. and separate them this scared her" (Tr. 3/11/2024, p. 83). M.'s ongoing concerns about being "watched" provides context for the January 2022 incident. 
The issues between M. and her father came to a head in January 2022. Father and Stepmother both credibly testified in detail as to this unfortunate incident involving M.'s phone. However, each adult failed to appreciate the significance of their actions on their relationship with M. Concerns regarding M.'s phone use began on a prior visit when Stepmother overheard a facetime conversation between M. and her mother where she referred to her father as "G." This conversation was overheard through M.'s bedroom door. Stepmother immediately reported M.'s comments to Father. However, she denied that she was eavesdropping. The use of the name "G." upset Stepmother and Father. Notably, the terms of the parties' Stipulation of Settlement specifically allowed M. to communicate with her mother during visits with her Father. Father was also allegedly concerned with M.'s phone use, as he believed that she had been "banned from TikTok" but didn't know the reason for the ban.
On a subsequent visit in January 2022, Stepmother claims she found M.'s phone lying on the kitchen table and brought it to Father. Stepmother testified M. left it "open," but M. vehemently denied this at the hearing. M. testified that she had no idea how her stepmother was able to access her phone as it password locks after a few minutes of non-usage. Stepmother and Father began scrolling through M.'s text messages to Mother. Although Stepmother claimed they were looking to discover why M. was banned from TikTok, they only read text messages between M. and her mother. After reading several messages, Father and Stepmother determined that M. was "spying" for Mother and reporting on their visits. They called M. into the room and reprimanded her. They also accused her of not appreciating their Christmas gifts. M. credibly testified that Father and Stepmother called her a "spy" and accused her of "spying" on them. M. denied that she was spying. She told her father that she was just talking to her mom as she was allowed to do during visits. Whether the term "spy" was used or not, the confrontation traumatized M. Father and Stepmother also told M. she was no longer allowed to bring her phone when she was visiting with them. This was devastating to M. as she felt more comfortable having her phone so she could remain in contact with her mother.
M. bravely recounted this traumatic incident in open court in front of her parents and her stepmother. Sobbing, shaking, and at times nearly incomprehensible due to emotion, M. testified as to this event, how it made her feel, and the continuing effect it has had on her relationship with her father. This incident, coupled with this litigation which she perceives as an attempt "to take D. away from her," has caused her to disconnect from her father and stepmother. Four [*13]therapists and three years later, M. continues to be estranged from her father and her position regarding visiting with him remains unchanged. She credibly testified that her mother in no way prevents her from contacting her father. She further rejects any attempt by Father to place the blame for their failed relationship on her mother. Rather, through therapy, she has learned that she should not be placed in circumstances that make her feel "uncomfortable" and visiting with Father makes her very uncomfortable. In addition to this incident, there are additional actions taken by Father that have strained their relationship. For example, M. is aware that Father has a tattoo of the name "D." on his arm but does not have a similar tattoo recognizing her as his child. She is also aware that Stepmother has changed her social media family profile picture to include only her father and D. although she had been included in the prior family picture. While this Court can understand Father's sadness and frustration at not seeing M., these choices have served to isolate and drive M. further away from any reconciliation.
Mother testified that, shortly after the January 2022 incident, when Father came to pick up M. and D. for their visit, M. had "an anxiety attack, was crying and had a breakdown" (Tr. 3/5/2024, p. 50). Mother initially encouraged M. to discuss the situation with her father, but M. was uncomfortable having the conversation. Mother then reached out to M.'s therapist, who she sees for anxiety and coping skills, for guidance. While the therapist was not called to testify at the hearing, the gist of her advice was that M. should not be forced to visit if it makes her feel uncomfortable. Correctly or incorrectly, Mother deferred to this advice and to M.'s wishes regarding visitation. While this accommodating approach is less than perfect for a custodial parent, under these unique circumstances it does not rise to the level of "deliberate frustration or active interference with the noncustodial parent's parental access rights." Matter of Lew v. Lew, 214 AD3d 732 (2d Dept. 2023); see also Melissa C.D. v. Rene I.D., 117 AD3d 407 (1st Dept. 2014). This Court finds that Father has failed to show that Mother is alienating M. from him. Rather it appears that M. has elected not to visit her father for a variety of reasons credibly testified to, and Mother has chosen to defer to her wishes, as recommended by the child's therapist. 
While Father was unable to prove that M. has been alienated from him by Mother and does not allege that D. has been alienated from him, the Court must consider Mother's "duty to foster." "One of the primary responsibilities of a custodial parent is to assure meaningful contact between the children and the noncustodial parent, and the willingness of a parent to assure such meaningful contact is a factor to be considered in making a custody determination." Matter of Navarro v. Clarke, 232 AD3d 797 (2d Dept. 2024). In this regard, Mother has taken a passive approach to addressing the rift between M. and her father. Mother credibly testified that she in no way stops M. from visiting, or contacting her father, but she no longer actively encourages contact. Rather she defers to the wishes of her daughter, and the advice of her daughter's therapist. While this does not rise to the level of parental alienation, Mother's laissez-faire approach to parenting does not encourage or foster M.'s relationship with father. It is the responsibility of a custodial parent to take steps to ensure a meaningful relationship with the non-custodial parent, especially during times when that relationship is strained. See Matter of Kim v. Becker, 223 AD3d 813 (2d Dept. 2024); see also Matter of Mcfarlane v. Jones, 193 AD3d 936 (2d Dept. 2021).
Unfortunately, there are additional examples of Mother's passive acceptance of M.'s acts which diminish the importance of her father. M. admitted that she refers to her father as "G.," but addresses her mother's fiancé as "dad." M. explained that she does so because her father [*14]"doesn't feel like a dad" while her mother's fiancé is "always there for her" and makes her feel comfortable (Tr. 7/23/2024, p. 10). M. even went so far as to contact her school guidance counselor to express her wishes to go by the last name "D*******" instead of "O." She first discussed this with her therapist who seemingly approved of it. This Court finds that Mother should not have permitted M. to refer to Father by his first name or change her last name from O. See Barnard v. Joyce-Barnard, 17 N.Y.S.3d 381 (Sup. Ct. Mon. Cty. 2015). The parties Stipulation of Settlement clearly indicates that the children shall not have any other surname than "O." and that the parents shall not permit the designations of mother or father to be used by the children in reference to anyone but their biological parents. In this instance, Mother has again deferred to the wishes of her daughter at Father's expense. Mother is hereby directed to withdraw M.'s request to use any surname other than O. forthwith.
Despite concerns regarding Mother's choices, Father's decision to withdraw his claims regarding M. has removed this Court's ability to order remedial services regarding Father's relationship with this non subject child. It is this Court's sincere hope that Father and Mother will devise a plan to reunify Father and M. through family reunification therapy or the equivalent. Mother is reminded of her obligation under the Judgment of Divorce to not allow M. to change her name or refer to her fiancé as "dad." Mother is further reminded of her obligation under the law to attempt to repair the relationship between M. and her father to the extent possible given M.'s current emotional state, and her maturity level. M. testified as to the stress caused by Father's attempt to separate her from D. This Court is hopeful that, after this litigation concludes, M. may be less fearful of losing her sister and may be more amenable to seeing her father again.
As indicated above, all of Father's allegations relate to his relationship with M., not with D. However, this factor relates only to D. As to this child, the record contains no evidence that Mother has not fostered D.'s relationship with her father, despite constant unsupported accusations of abuse and neglect. Rather, the record supports a finding that Mother has consistently accepted and facilitated changes in the parties' visitation schedule to accommodate Father's work schedule. She also shared driving responsibilities although she had no obligation to accommodate this request. In this regard, the parties' Stipulation of Settlement clearly indicates that Father shall be solely responsible for transporting the children to and from visitation.
Against this factual background, this Court finds that, after this lengthy best interests hearing Father has woefully failed to establish that D. is being alienated from him or is at risk of being alienated from him. Notwithstanding Father's allegations of alienation, nothing in the record suggests that M.'s refusal to visit has had any impact on his relationship with D. While Mother could do more to foster M.'s relationship with her father, deference to her daughter's wishes does not rise to the level of parental alienation. As such, while this factor has been given serious consideration by the Court, it does not weigh in either parties favor. Both parties should have made better choices when it came to the relationship between M. and her father. Fortunately, D.'s relationship has not been negatively affected by M.'s refusal to visit with her father. There is no evidence that Mother is unwilling or incapable of fostering D.'s relationship with her father. Moreover, even if M. remained a subject child on this application, there is no evidence that she has been alienated from her father or that Mother caused the current state of their relationship. 
(6) The Forensic Evaluator
By Order dated September 22, 2022, Dr. Stephen P. Herman M.D. was appointed to conduct a forensic evaluation of the parties and both children. However, on March 15, 2023, the parties stipulated to modify the September 22nd Order to indicate that Father was only seeking custody of D. Dr. Herman issued his report on or about September 20, 2023. The recommendation of the forensic evaluator was a factor considered by this Court in making its determination. See Matter of Nieves v Nieves, 176 AD3d 824 (2d Dept 2019).
As part of his evaluation, Dr. Herman considered several collateral sources of information. His report was entered into evidence without objection but with certain redactions. Dr. Herman testified before this Court on October 26, 2023, and January 22, 2024. Without objection from counsel, Dr. Herman was qualified as an expert in "child custody forensic psychology."
After a lengthy analysis of both parties and the children, Dr. Herman's report recommends that Mother should have "full custody of and primary residence with D." Based on his observations of the interactions between D. and her mother, Dr. Herman concluded that Mother "has a clear understanding of D.'s needs and about autism in general." Dr. Herman's report went on to state that the Defendant "demonstrated detailed knowledge of D.'s growth and development and even persisted when she felt an initial evaluation was lacking in its findings." Dr. Herman did not observe any evidence of abuse or neglect and does not share Father's concerns regarding Mother's care for D.
While Dr. Herman does not doubt D.'s and her father's mutual love, the interactions he observed between the two were in stark contrast with those of Mother. Unlike Dr. Herman's opinion that Mother is deeply involved in all aspects of D.'s care, Father appeared "unsure about several aspects of D.'s growth and development." In his report, Dr. Herman notes that Father "related to this child more as an infant, and at times in an inappropriate and silly manner." When asked by D.'s attorney what Father's understanding of D.'s needs are, Dr. Herman testified as follows:
"I think he knows that she has this diagnosis. From what I observed it did not appear to me remotely that, while he loves her, he does not or did not at the time demonstrate how to relate to this child, to D., as I said in my report and described in my report his interactions with her. Aside from demonstrating or saying, and I think so, that he loves her very dearly." (Tr. 10/26/2023, pgs. 42-43, lines 21-2)
In addition to his final opinion that physical custody of D. should remain with Mother, Dr. Herman also makes several recommendations to the parties. Dr. Herman recommends that Father reach out to professionals and/or organizations for assistance on how to interact with D. appropriately and to better understand the nature of her disability. Dr. Herman further indicates that he has concerns regarding M. and a possible lack of discipline on the part of Mother. He also indicates that he believes M. is hurting although she doesn't show it. Dr. Herman strongly recommends that the parties engage in family therapy to address the issues between M. and her father, and that Stepmother should be included at some point in the future, when clinically appropriate. 
Ultimately, Dr. Herman opines that Mother should have primary custody of D. as she is more capable of caring for her special needs. Moreover, Dr. Herman believes that since Father works a full-time job, if custody of D. were awarded to him Stepmother would become her [*15]defacto primary caretaker, which he feels would be inappropriate (Tr. 10/26/23, p. 134). While Dr. Herman shares many of Father's concerns regarding Mother's fiancé J.D., it was not a significant enough factor to change his opinion regarding custody. This Court has given some weight to the opinion of the forensic evaluator, but less weight than the other factors addressed herein. See Matter of Wilson v Bryant, 143 AD3d 905 (2d Dept 2016); see also Matter of Mondschein v Mondschein, 122 AD3d 636 (2d Dept 2014).
(7) Attorney for the Subject Child
The position of the subject child's attorney was also considered by this Court. See Matter of Fallo v Tallon, 118 AD3d 991 (2d Dept 2014). The position of the attorney for the child is not determinative but is a factor to be considered and is entitled to some weight. See Baker v Baker, 66 AD3d 722 (2d Dept 2009); see also Matter of Kozlowski v Mangialino, 36 AD3d 916 (2d Dept 2007). Mr. Scott Schwartz zealously represented the subject child throughout this case and was actively involved in the evidentiary hearing. Given D.'s pervasive special needs, Mr. Schwartz substituted his judgment for hers. See Silverman v. Silverman, 186 AD3d 123 (2d Dept. 2020).
In his post-hearing summation, Mr. Schwartz argues that Father has not met his burden of proof that a change of custody would be in D.'s best interests. Specifically, he argues that Father failed to establish that Mother is in any way unfit to have residential custody of D., or that she alienated M. in such a way as to raise concerns as to D.'s relationship with her father.
While Mr. Schwartz takes the position that legal custody should remain as is, and physical custody of D. should remain with her mother, he does not oppose Father's application to expand his parenting time with D., assuming it does not interfere with D.'s school or services and does not substantially alter her routine. Mr. Schwartz does not believe that a substantial change in pickup and drop-offs is warranted. However, he suggests that the parents should share in the transportation of D. The position of the attorney for the child has been given some weight. See Matter of Conway v. Gartmond, 108 AD3d 667 (2d Dept. 2013). 
Custody of D.
"In determining whether a custody agreement that was incorporated into a judgment of divorce should be modified, the paramount issue before the court is whether, under the totality of the circumstances, a modification of custody is in the best interests of the children." Cook v. Cook, 142 AD3d 530 (2d Dept. 2016). After considering all the relevant factors indicated above, this Court finds that Father has failed to meet his burden to establish that he is the better custodial parent for D. such that the parties' agreed upon custodial arrangement should be modified. After considering a totality of the circumstances, but with specific attention paid to the factors discussed above, this Court finds that Mother is the parent more capable of addressing the subject child's social, intellectual and developmental needs and general wellbeing. See Rosenberg v. Rosenberg, 145 AD3d 1052 (2d Dept. 2016). A change in custody to Father is also opposed by the attorney for the subject child, and by the forensic evaluator. See Matter of Ivan J. v. Felicia V., 228 AD3d 506 (1st Dept. 2024); see also Tyra H. v. Tariq M., 231 AD3d 595 (1st Dept. 2024).
While this Court has concerns regarding Mother's acceptance of M.'s refusal to have contact with her father, M. is not the subject child of this proceeding. Moreover, this Court does not find that M. is being actively alienated from Father by Mother. See Matter of Burke v. [*16]Squires, 202 AD3d 784 (2d Dept. 2022). Rather, M.'s estrangement results from many contributing factors, including Father and Stepmother's own actions against this child. See DiNapoli v. DiNapoli, 200 AD3d 1027 (2d Dept. 2021). In any event, there is no evidence whatsoever that Mother has failed to foster a relationship between D. and her father, or that their relationship is in any way in danger of becoming estranged.
Finally, this Court finds that if it were to grant Father's application, it would result in the separation of D. from M. and T., which is inappropriate absent a showing that it would be in D.'s best interests. See David W. v. Julia W., 158 AD2d 1 (1st Dept. 1990); see also Santoro v. Santoro, 224 AD2d 510 (2d Dept. 1996). Father has failed to make such a showing. Moreover, this Court finds that separation would be traumatic to both D. and M. and would also separate D. from her friends, school, services and social support system. See Zarou v. Levine, 216 AD2d 292 (2d Dept. 1995). "Stability of the child's environment and a reluctance to uproot the child from familiar surroundings is relevant and an important consideration." Moorhead v. Moorhead, 197 AD2d 517 (2d Dept. 1994). Likewise, a change in custody would remove D. from her extracurricular activities and services that she receives in New Jersey which could potentially regress her development while Father attempted to secure replacement services in New York. See Matter of Larkin v. White, 64 AD3d 707 (2d Dept. 2009)
In conclusion, this Court appreciates Father's sincere request for a change in custody and does not believe that he is financially motivated. However, he failed to establish that he is the more fit custodial parent such that he should be awarded sole custody of D. See Matter of Handakas v. Bardatsos, 215 AD3d 840 (2d Dept. 2023); See also Matter of Boone-Robinson v. Robinson, 226 AD3d 892 (2d Dept. 2024). Moreover, he has failed to establish that a change in custody would significantly enhance D.'s life such that her current living situation should be disrupted and the stipulated custodial arrangement modified. See Matter of Olivieri v. Olivieri, 170 AD3d 849 (2d Dept. 2019); see also Matter of Baker v. Durham, 68 AD3d 1105 (2d Dept. 2009); Matter of Moran v. Cortez, 85 AD3d 795 (2d Dept. 2011). As such, Father's application for a change in custody is hereby denied. The agreed upon custodial arrangement in the parties' Stipulation of Settlement shall remain in effect except as modified below.
Modification of Parenting Time
Father has plead, in the alternative, for expanded visitation with D. Mother has not offered more than a perfunctory opposition to this request and D.'s attorney has indicated that he takes no position. Father has also expressed concerns with the parties' agreed upon transportation agreement, as he claims that Mother's move to New Jersey, although foreseen and permitted, has frustrated his parenting time. The parties' current agreed upon custodial arrangement grants Father "liberal visitation" including but not limited to "one day during the week, after school until 8:00 PM" and "every other weekend [from] Friday at 6:00PM through Sunday at 6:00PM." The agreement has a provision allowing for the parties to stipulate to additional visitation. The agreement also makes Father solely responsible for all transportation to and from visitation.
While the parties agreed to the current schedule in their Stipulation, Father has placed his parental access at issue by requesting expanded time with D. Moreover, the current discord between the parties will likely make it difficult for them to agree upon additional "liberal parenting time" as anticipated by the Stipulation. Whenever possible, the best interests of children are best served when they are being nurtured and guided by both biological parents as [*17]much as possible. See Matter of McLaren v. Heuthe, 296 AD2d 500 (2d Dept. 2002). Father has established that he has a close loving bond with D. and that he wishes to spend more time with her, so he can be more involved in her development. No party has argued why additional time would be inappropriate so long as it does not interfere with D.'s school, services, or extracurricular activities. Accordingly, this Court finds that it would be in D.'s best interests to expand the current visitation to the limited extent indicated herein. See Matter of Gartmond v. Conway, 40 AD3d 1094 (2d Dept. 2007); see also Castro v. Castro, 292 AD2d 556 (2d Dept. 2002); Matter of Ennis v. Piterniak, 134 AD3d 823 (2d Dept. 2015). 
This Court finds that it is in D.'s best interests for Father's time to be expanded and for the transportation obligation to be shared between the parties. Accordingly, in addition to the visitation schedule set forth in their Stipulation of Settlement, Father's alternate weekend visitation shall be expanded to Monday morning. Father, or Stepmother if Father is working, shall return D. to school on Monday mornings. The Court further finds that Mother should drop D. off in the Target parking lot on Veteran's Road in Staten Island for the commencement of his weekend visitation on Fridays. All other exchanges between the parties shall occur curbside at D.'s home. Father should regularly utilize his weekday dinner visits with D. as she enjoys spending time with him. This Court is also hopeful that if Father utilizes his weekday parenting time and picks D. up curbside, M. may be enticed to join them. Father is directed to email Mother three days prior if he will not be utilizing his midweek visit in any given week.
In addition, it is strongly suggested (but not ordered) that the parties and M. engage in family reunification therapy as suggested by Dr. Herman. It is this Court's hope that all the adults involved in M.'s life will work towards repairing M.'s relationship with Father so that the close bond they once shared is restored in the future.
This constitutes this Court's Decision and Order relating to Motion Sequence Number 001. Any aspect of relief requested therein, but not specifically addressed herein, is hereby denied. All aspects of the parties' Judgment of Divorce remain in full force and effect subject to the modifications set forth herein. 
Dated: April 10, 2025
Hon. Catherine M. DiDomenico
A.J.S.C 

Footnotes

Footnote 1:At the close of Father's case, Mother (joined by Mr. Schwartz on behalf of D.) made an oral motion for a directed verdict to dismiss Father's motion for failure to show a sufficient change in circumstances. To the extent the decision was reserved on the directed verdict motion, it is now denied.

Footnote 2:This hearing was held on October 4, 5, 12, 25, 26, 2023 and January 22, February 26, March 5, 6, 11, May 15, July 23 and August 7, 2024, and generated a voluminous hearing record encompassing over thirteen hundred pages.

Footnote 3:As M. was no longer the subject of this custody modification application, this Court found, after motion practice, that it was inappropriate for her testimony to be heard "in camera" outside the presence of her parents, particularly since her testimony was likely to be adverse to Father. For this reason, and in accordance with M.'s own wishes, this Court permitted M. to testify in open court.

Footnote 4:Father also spent a considerable amount of hearing time trying to establish that Mother, or her fiancé, were physically abusing D. based on the presence of alleged "grab bruises" on the child. However, beyond speculation, Father offered no evidence of physical abuse nor that Mother or anyone in her household caused the alleged "bruises."

Footnote 5:A similar claim was addressed by this Court in a case involving distinguishable facts. See Y.B. v. G.B., 174 N.Y.S.3d 820 (Sup. Ct. Rich. Cty. 2022)